**WALLACE v. F. W. WOOLWORTH CO.**

Civil Action No. 1983.

District Court, E. D. New York.

June 9, 1942.

Pennie, Davis, Marvin & Edmonds, of New York City (W. Brown Morton and H. Stanley Mansfield, both of New York City, of counsel), for plaintiff.

Briesen & Schrenk, of New York City (Fred A. Klein and Henry C. Quigley, Jr., both of New York City, of counsel), for defendant.

BYERS, District Judge.

This is a suit for claimed infringement of plaintiff's United States Letters Patent No. 2,236,387, dated March 25, 1941, for a perspiration inhibiting composition called Arrid (application filed May 3, 1938).

The defendant has sold the offending article, known as "Hind's Deodorant Cream", which was manufactured by Lehn & Fink Products Corporation; the latter assumed the defense of the action by the terms of a written stipulation, which also covers the giving of notice to the defendant on April 24, 1941.

The complaint was filed on April 28, 1941. The question litigated is validity, for while infringement is not conceded in so many words, there can be no doubt that, if the plaintiff has demonstrated patentable invention, he is entitled to the customary relief against the defendant.

Of the 16 claims in the patent, all but four (4, 9, 10 and 14) are in suit. Many of these are so drawn as to broadly cover an astringent composition consisting of ingredients classified according to their chemical characteristics, but for present purposes a concrete embodiment of the concept alone need be quoted—thus claim 12:

466

"A cosmetic astringent preparation including aluminum sulphate as its essential astringent ingredient together with urea."

The aluminum sulphate and urea are embodied in a non-drying cream for convenient application, but no reaction not otherwise intended is thereby effected. The aluminum sulphate constitutes about 21%, and the urea about 12% of the composition, the base or cream accounting for about 66% of the bulk of the commodity.

The defendant's product contains 17% aluminum sulphate, 11% urea, and 72% cream base. Thus, in the practical sense, the two preparations are sufficiently alike to preclude any issue of infringement.

The theory of plaintiff's patent and its operation, if presently understood, may be stated thus: When the aluminum sulphate is placed upon the human skin, a hydrolysis or decomposition ensues, due to the reaction of the proteins of the skin upon the former; that sets up an excess acidity which, if not modified, would have a deleterious effect, surely upon textile fabrics to which the compound is transferred, i. e., the armpit portions of apparel; and perhaps (although this is debatable) upon the affected area of the skin itself.

It is necessary to pause sufficiently to observe that this primary reaction is a necessary one, as otherwise the astringent properties would not be released, and the output of the perspiration glands would not be restricted, which is the desired result; the proof is that the flow of perspiration is reduced by application of the plaintiff's composition by about 50%, and the urea was not introduced to avoid that achievement, but to mitigate its twofold (if it be that) effect. The urea then combines with the excess acid component then generated, and thereby deprives it of the capacity to destroy the portion of the fabrics of apparel to which the composition in the form of cream is transferred, when at any subsequent time the heat of a pressing iron is applied to remove wrinkles, etc.

It is with reference to the aspect of the controversy thus exposed that the argument against validity is most plausible, for if urea was introduced to promote the conservation of textile fabrics, it is indeed difficult to avoid the conclusion that such an expedient was well known prior to plaintiff's application date. If urea was introduced primarily to ameliorate the astringent reaction of the aluminum sulphate, the evidence is not persuasive that such an expedient was taught in any prior patent or publication. Which is not to say that to devise that new combination would necessarily constitute patentable invention under the present dispensation governing such matters. See Picard v. United Aircraft Corporation, 2 Cir., 128 F.2d 632, decided May 28, 1942, both the opinion of the Court and the concurring meditations. Apparently the restricted monopoly of patent rights is not to reward "the exercise of persistent and intelligent search for improvement". Such is not deemed to "reveal the flash of creative genius" specified as requisite in Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. ——.

And yet it must be recalled that genius has once been defined as the infinite capacity for taking pains. The approved approach to most unsolved problems is the studious and often plodding one, and no reliable substitute has been suggested, even though a solution thereby accomplished is not judicially deemed to attain to the status of patentable invention. Such is the minimizing lens supplied to a district judge for scrutinizing a patent submitted for adjudication.

As to the part which the urea plays in arresting skin irritation which would result from application of aluminum sulphate alone, the only direct testimony is by the defendant's witness, Dr. Peck, a practicing dermatologist, who says that, except as to persons having specially sensitive skin, there is no irritation so caused. Since that statement was not contradicted, it must be accepted. It is the only medical as distinguished from chemical testimony in the case, and no reason has been shown for disregarding it.

The utmost that can be said for the contrary theory, as stated at line 10 of page 1 of the specifications of plaintiff's patent, is that skin-irritant property was ascribed to aluminum sulphate (and chloride) in apparent sincerity, and the addition of urea was deemed to be justified, in part at least, to arrest or overcome that tendency. It cannot be said, however, that there is evidence in the case to vindicate the theory.

That subject would be important in the commercial appeal of the product, but whether it was more than a mere talking point is so doubtful that, as the case is presently understood, no affirmative finding would be justified that urea was introduced to obviate a tendency to skin irritation

caused by the application of aluminum sulphate.

A shaving cream was patented, for use on the affected area of the human anatomy, by Carlson No. 2,145,583 (application December 6, 1934), having a claimed tendency to stop perspiration, using, for instance, aluminum sulphate in a cream to which is added zinc stearate. Defendant's witness Klermann says that the acid effect of the former is thereby reduced. At page 1, line 30, Carlson states that her discovery "makes it possible to use astringents as antisudorifics which are milder and harmless to clothing in place of aluminum chloride * * *". This patent did not anticipate, but indicates that the nature of the problem which the plaintiff is assumed to have solved, was recognized as early as 1934. Aluminum sulphate had been broadly employed as an astringent prior to 1936.

Turning now to the general understanding in 1936 and prior thereto concerning the introduction of urea as an approved agent to mitigate the effect of strong acid salts upon textile fabrics—not however in connection with any such product as the one here involved—the following patent should be mentioned:

Koch No. 2,011,292. He dealt with aluminum acetate and aluminum formate. Wallace (the plaintiff) overcame this citation in the patent office by deposing that those salts are not effective to prevent the flow of perspiration. If that be true, and it must be so taken for present purposes, the fact remains that for the purposes of fabric protection the teaching was so close to the action of aluminum sulphate as to challenge instant inquiry on the part of so experienced a chemist as Wallace.

The opinion presently held is that the combination of urea with aluminum sulphate in this patent was arrived at primarily to yield a chemical composition which would accomplish a definite purpose, without injury to wearing apparel, for, no matter how appealing it might be in the dermatological or cosmetic sense, if it could not be used without incurring the risk of damage to clothing, it could not be commercially successful.

So much Wallace had demonstrated by his own earlier experience.

The thing that he did had been taught by Koch with reference to mitigating the acid reaction of two aluminum salts of weaker constituency when applied to fabrics, by combining urea with them.

Under the rather rigid requirements to which reference has been made, it is thought that the effectuation of the concept that aluminum sulphate could be similarly restrained did not constitute patentable invention.

The other arguments advanced by the defendant have been weighed and found wanting. The finding is:

The plaintiff's patent does not embody patentable invention.

The conclusion is that the complaint must be dismissed with costs.

Settle decree.