**WALLACE v. F. W. WOOLWORTH CO.**

**No. 147.**

Circuit Court of Appeals, Second Circuit.

March 3, 1943.

Pennie, Davis, Marvin & Edmonds, W. B. Morton, and H. Stanley Mansfield, all of New York City (W. B. Morton, of New York City, of counsel), for appellant.

Briesen & Schrenk, of New York City, (Fred A. Klein and Henry C. Quigley, Jr., both of New York City, of counsel), for appellee.

Before L. HAND, AUGUSTUS N. HAND, and FRANK, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

This is an action by John H. Wallace, Jr., against F. W. Woolworth Company for infringement of U. S. Patent No. 2,236,387, issued on March 25, 1941, to the plaintiff John H. Wallace, Jr., as assignee of the interest of the joint inventor Wilfred C. Hand.

The subject of the patent in suit is a cosmetic preparation for checking the flow of perspiration. Such preparations have been sold for a number of years and have generally consisted of a water solution of aluminum chloride or aluminum sulphate which have an advantage over other acids and the acid salts of other metals in being cheap and in not deteriorating on standing.

It appears from the specification that the invention relates to improved perspiration retarding or inhibiting compounds. It states that it had been the prior practice to retard the flow of perspiration by the application of solutions containing an acid salt of a heavy metal, usually aluminum chloride or aluminum sulphate, and that such solutions, while effective in stopping perspiration, were unsatisfactory because they frequently produced skin irritations and rotted clothing fabrics in contact with the treated areas. It is said that in an attempt to mitigate the action of these compounds the solutions were permitted to dry on the skin and the skin was thereafter wiped off with a damp cloth before the clothing came in contact with them; but the solutions dried slowly and the precautions were frequently disregarded. The specification goes on to say that in the case of aluminum sulphate the aluminum or aluminum hydroxide ion combines with and coagulates the skin proteins only in the presence of the sulphate radical and that as a result a residue of sulphuric acid remains which rots the clothing. Finally the specification describes a perspiration retarding agent which is claimed as an improved invention that contains a neutral protective ingredient selected from the amides and amino acids of which urea is an example. Claim 12 may be taken as a typical embodiment of the invention and describes the composition of the product as follows:

"12. A cosmetic astringent preparation including aluminum sulphate as its essential astringent ingredient, together with urea."

The question before us is whether it constituted patentable invention to combine urea with a solution of aluminum sulphate when the solution, while sufficient to check the flow of perspiration, would leave a residue of sulphuric acid that would tend to rot fabrics which came in contact with it or to irritate the skin or both. It is established by evidence in the record that the introduction of urea will eliminate or mitigate the effects of any residue of sulphuric acid that is derived from the original solution and is apparently augmented by a reaction from the proteins of the skin.

While the commercial products which have been used as anti-perspirants have consisted of aluminum sulphate or aluminum chloride, the specification named a wide variety of agents comprising strong acid salts "of one or more metals, such as aluminum, zinc, cerium, zirconium, titanium, iron or bismuth. * * *" No attempt was made by the patentee to show the commercial use of any other "protective ingredient" than urea, though in his specification he broadly described as an "ingredient" "a chemical selected from * * * the amines and the amino acids" and stated that: "Examples of amides which are suitable for use as the protective ingredient of our composition are the lower aliphatic and aromatic amides, such as formamide, acetamide, carbamide (urea) and derivatives thereof." While the specification states that the preparation "may be easily applied in liquid, semi-liquid or other forms," the commercial products put out were in the form of creams rather than of liquid preparations.

The plaintiff, Wallace, testified that in 1935 he knew that if urea was added to an acid it would reduce the acidity. The plaintiff's witness Killian testified that he possessed the same knowledge when he began his experiments early in 1936. U. S. Patent No. 2,011,292 to Koch (issued August 13, 1935) taught that a solution of aluminum formate containing 8 per cent of urea could be used with special advantage in the textile industry because the compound did not contain any substances having "a detrimental effect." The U. S. Patent No. 2,174,534 to Shipp (issued October 3, 1939, the application for which was filed April 22, 1936) also suggested the use of urea to retard the deleterious effect of sulphuric acid upon cellulose fabrics. The U. S. Patent No. 2,145,583 to Carlson (issued January 31, 1939, the application for which was filed December 6, 1934) was for a shaving cream tending to stop perspiration under the arms. It mentioned aluminum sulphate as an anti-perspirant, included zinc stearate as a protective ingredient and stated that the mixture would be "harmless to clothing." Montenier in U. S. Patent No. 2,230,082 disclosed that the excess acidity of aluminum chloride was destructive to clothing fabrics in anti-perspirant compounds and prescribed the use of urethene, urea and other agents to counteract the effect of the excess hydrochloric acid.

In the Spring of 1935, the patentees began to work on an anti-perspirant that would not injure clothing. First they used creosol sulphuric acid and found it too strong and accordingly added percentages of sodium hydroxide, citric acid, phosphoric acid and tartaric acid, but the result was unsatisfactory. They then tried "a complete range of alkalis" to neutralize the acid and finally urea and related compounds. The urea seemed to do the trick and, when aluminum sulphate was used as an equivalent of the creosol sulphuric acid, produced a commercially satisfactory article that met with wide success.

This is a typical case of patient experiment to achieve a useful result. There was no long felt want. As soon as an astringent was used to check perspiration, the acidity of which proved to be excessive, urea was the neutral protective ingredient that about the same time occurred to Wallace, Hand, Killian and Montenier and even before them was known by chemists to protect textiles against acids, as is shown by the patents to Shipp and Koch.

We have repeatedly held that skillful experiments in a laboratory, in cases where the principles of the investigations are well known, and the achievement of the desired end requires routine work rather than imagination, do not involve invention. Ruben Condenser Co. v. Aerovox Corporation, 2 Cir., 77 F.2d 266, 267; Ruben Condenser Co. v. Copeland Refrigeration Corp., 2 Cir., 85 F.2d 537, 541; Fink v. V. Foscato, Inc., 2 Cir., 79 F.2d 842, 843; Claude Neon Lights, Inc., v. Rainbow Light, Inc., 2 Cir., 90 F.2d 959, 962. This is not to say that such steps might not perhaps lead to invention, if the result was sufficiently unexpectable.

But in the present case ingredients having well known attributes were employed until the proper proportions were reached and a well known anti-perspirant was combined with a neutralizing agent that would prevent injury to the clothing and skin without destroying the effects of the anti-perspirant as an astringent. No particular talent was involved in developing the plaintiff's product but only a process of routine experimentation by industrious chemists. The result achieved was apparently reached by other chemists contemporaneously through investigation indicated by familiar chemical principles.

Judgment affirmed.