## WALLACE v. MANDEL BROS., Inc.
### No. 9261.

Circuit Court of Appeals, Seventh Circuit.

Dec. 12, 1947.

Rehearing Denied Jan. 6, 1948.

Charles J. Merriam and William J. Stellman, both of Chicago, Ill., for appellant.

Thomas H. Sheridan and Charles R. Sprowl, both of Chicago, Ill., for appellee.

Before EVANS and MAJOR, Circuit Judges, and LINDLEY, District Judge.

LINDLEY, District Judge.

Plaintiff, owner of the Wallace and Hand patent No. 2,236,387 applied for May 3, 1938, issued March 25, 1941, appeals from a judgment of invalidity of Claims 1 to 6, 8 to 13, 15 and 16 inclusive. The District Court found that if the claims are valid, defendant infringes.

The patentees claimed "a perspiration inhibiting composition" of a liquid "solution of aluminum sulfate" or, as an alternative, "aluminum chloride," both well known and long used in anti-perspirant compositions in liquid form, to which they added a new element, urea (carbamide), as they said, as "a neutral protective ingredient." In their specifications they stated that their invention related to an improved perspiration retarding or inhibiting compound; that it had previously been proposed to control the flow of perspiration from certain skin areas by application of solutions containing an acid salt of a heavy metal, usually, aluminum chloride or aluminum sulfate; that such solutions, though effective in retarding perspiration, had proved unsatisfactory and hazardous in that their use frequently produced acute skin irritation and destroyed the clothing fabric with which they came in contact. They discussed various prior un-

successful attempts to overcome this disadvantageous effect, saying that, prior to their invention, corrosive action of effective perspiration inhibiting preparations had been considered inherent and unavoidable. They commented upon other scientists' tested additions of alkalies to the old compounds, stating that when such acid counteracting agents were added, the perspiration retarding action was destroyed· They asserted that in their composition they had advantageously retained the desirable retarding effects of previous compounds and had, by the addition of urea, done away with corrosive action, thus avoiding any harm to skin or fabric. It is apparent, therefore, that their asserted invention is the use, in combination with elements known to the prior art, of urea, which has the quality of removing the undesirable corrosion of earlier commercial preparations, while, at the same time, retaining their advantages, which, plaintiff asserts, result from retention of acidity.

The court found that the acidity of earlier compounds had been harmful in that it irritated sensitive skins and injured the user's clothing; that urea is an organic compound, neutral in its action; that when added to the old preparations it does not weaken the perspiration inhibiting effect as did addition of the alkalies which counteracted the acid content and that the new composition successfully prevented corrosion and consequent injury to skin and fabric. In this respect, the evidence is convincing that Wallace's composition was tremendously successful commercially. We think, too, that the evidence discloses clearly an existing public demand for a compound possessing the desirable qualities mentioned and a fulfillment of that demand by the patented product.

However, the patent has been in litigation before the District Court of the United States for the Eastern District of New York, wherein it was held to have been anticipated. Wallace v. F. W. Woolworth Co., D.C., 45 F·Supp. 465. The decision was affirmed in 2 Cir., 133 F.2d 763. Plaintiff insists that the evidence in that case has been supplemented by such additional evidence as to impel a contrary decision upon our part.

The trial court discussed various prior art references including Schupphaus, No. 514, 838 of February 13, 1894; Missbach, No. 2,069,711, February 2, 1937, application filed January 23, 1935; Shipp, No. 2,174,-534, October 3, 1939, applied for April 22, 1936, and Koch, No. 2,011,292 of August 13, 1935. Schupphaus was interested in "securing the chemical stability of nitro-compounds," that is, explosives· He said that it was well known that "such compounds, when stored for a long period of time, often undergo decomposition, which, slight at first, gradually increases until the whole compound has become more or less decomposed"; that others had attempted to overcome decomposition by adding to nitro-compounds an alkali such as silicate of soda, carbonate of lime, magnesia and others, without success, for the reason that such alkalies being unstable themselves, had failed to prevent decomposition and that he had succeeded by using urea "as a neutralizer," which, he said, "penetrates every article of the nitro-compound" and arrests decomposition. In short, his claims prescribed the process of securing chemical stability in a nitro-compound by adding to the compound or incorporating therein, urea as specified. Concerning this patent the District Court said: "Schupphaus suggested the use of urea as a neutralizer, which he had found effective."

Koch was coping with the problem of a stable solution of aluminum acetate or aluminum formate. He suggested as novel, addition to old compounds of various elements including the alcohols and urea or thiourea. He added to the old solution this new element, teaching that this addition created stability of such solutions and that the resulting compound might be evaporated to dryness without decomposition of the aluminum salts. In his claims, therefore, he prescribed adding to well known solutions of alumium salts "urea, thiourea. N-alkyl and aliphatic N-acyl derivatives of these compounds and salts of urea"; the resulting solution, he claimed, would not decompose and could be "evaporated to dryness." The District Court made no finding as to Koch; evidently it considered the reference inapplicable.

Missbach sought to improve cleaning solutions, such as carbon tetrachloride. He said that the compounds then being made tended to become corrosive; that the liberation of acid in them caused decomposition and that he proposed that they be stabilized and decomposition and corrosion neutralized by addition of another element. The additional factor, he said, need only be present as a small fraction of 1% of the total, such a small portion being efficient in stabilizing the solution. He suggested for his purpose various compounds such as the alcohols, polymerized castor oil, and others, including a group of compounds "which can be considered as derived from urea, termed ureides." He said that the addition of such an element to the old solutions neutralized or removed acid and retarded "the production of acid." He did not limit his invention to the use of a single substance but said that he might employ two or more of the suggested additional compounds. He claimed "Carbon tetrachloride containing a stabilizing amount of a ureide" and "carbon tetrachloride containing a stabilizing amount of guanidine." Concerning Missbach the trial court said: "We do not find anything in this patent that teaches that urea will inhibit the corrosive effect while leaving the solution sufficiently acid to be astringent."

But, said the District Court, "Shipp * * * is different." It found that "Urea was used by Shipp not as a neutralizer, but as an inhibitor of corrosive action and said that if addition of urea to a 96% solution of sulphuric acid would retard the corrosive or degrading effect upon cotton fabric, it might well be thought it would inhibit the corrosive action on skin or fabric and the acid residue left on the skin after using the ordinary preparations containing aluminum sulfate or chloride," and continued that "nothing but experimentation to be expected from skilled chemists was required to translate the disclosure of the corrosion inhibition of urea in the Shipp patent into the disclosure of the patent in suit for the inhibition of corrosive action of acid present in an anti-perspirant composition."

It is obviously necessary to determine whether the references lie within the confines of the prior art by which Wallace and Hand were bound, or whether they lie in an art lacking in analogy to anti-perspirants. Shipp, as the court found, was dealing with finishing manufactured textiles on which desired sheens were obtained by bath in concentrated sulphuric acid at room temperature. The old compound had been used by applying it to the fabric and, if at once removed the desired finish was obtained, but if it were permitted to remain longer in contact with the fabric, the latter was destroyed. Shipp taught that if there should be added as much as 25 parts of urea to 100 parts of the concentrate the fabric might be subjected to contact with the compound for a slightly longer period; as he said, for as long as 60 seconds, without damage. He suggested as alternative diluents various alcohols, ethers, acetone and still others, none of which is of value in perspiration inhibiting compounds. Schupphaus was concerned solely with decomposition of explosives; Missbach with corrosion of cleaning compounds; Koch with stability of solutions of aluminum salts.

 Though an inventor is conclusively presumed to know the prior art in his own and clearly allied lines of endeavor, Ottinger v. Ferro Stamping & Mfg. Co.. 6 Cir., 59 F.2d 640, he is not bound by what has been done in remote or nonanalogous arts. Alemite Mfg. Corp. v. Rogers Products Co., Inc., 3 Cir., 42 F.2d 648. A reference, in order to be effective to disprove the novelty of an alleged invention, must relate to the same art as the questioned invention or to an analogous or closely related art. In A. J. Deer Co., Inc. v. United States Slicing Machine Co., 7 Cir., 21 F.2d 812, 813, this court said: "We are of opinion that whether arts or uses are analogous depends upon the similarity of their elements and purposes. If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then we are of opinion that such arts must be said to be analogous, and, if the converse is true, they are nonanalogous arts."

In Radiator Specialty Co. v. Buhot, 3 Cir., 39 F.2d 373, 374, it was held that the inquiry as to whether two arts are analogous should be pursued along lines that distinguish not merely the physical differences in the arts but particularly the differences in their problems. In considering whether the stopping of leaks in hot water systems is analogous to the stopping of leaks in automobile tires, the court stated: "There has been a tendency, because of the fact of leaks and the common desire to stop them wherever they occur, to regard both arts as one. In consequence, the crowds of inventors in the two arts have become badly mingled and their inventive conceptions have become mixed and confused when applied to the problems and remedies of one art or the other. The test whether the arts are the same or different lies not in the fact, or in the thought, of leaks, common to both arts, but in the difference in leaks, in the place of the leaks, in the problems arising from difference in place and structure and in the means and methods of solving them."

This court said in Copeman Laboratories Co. v. General Plastics Corp., 7 Cir., 149 F.2d 962, at page 964: "It is difficult to perceive how the making of chocolate drops is an art related to that of freezing ice cubes. The envisionment and uses of the two are entirely dissimilar. One has to do with contraction of chocolate and the other with expansion of ice. The patents themselves show not only that a different problem was involved, but the objective sought to be accomplished was also different. Those patents pertaining to the chocolate drops were, with the exception of Burger, trying to find a better means of cooling the chocolate in the matrices of the construction. One of defendant's witnesses admitted that the rubber used in the matrices was readily wettable by the chocolate; in the ice cube art the problem was to find something nonwettable by water. We are of the opinion that a person skilled in the art of making ice cube trays would not be expected to be conversant or familiar with the art pertaining to chocolate drops. An examination of the patent leads us to the conclusion that these patents concerning chocolate molding devices are non-analogous art and therefore not a pertinent reference. See Alemite Mfg. Corp. v. Rogers Products Co., Inc., 3 Cir., 42 F.2d 648, 651."

Analogy in a complex field like chemistry is much more elusive than in the relatively simpler field of mechanics, Naylor v. Alsop Process Co., 8 Cir., 168 F. 911, for chemistry is essentially an experimental science and its foresight no more certain today, in spite of the accumulation of knowledge, than it was in former times, General Electric Co. v. Laco-Philips Co., 2 Cir., 233 F. 96. Chemical action and reaction can rarely be foretold except in cases of well-established, definite and usually small groups of compounds. Even in these, the question often arises as to whether one member of a class will act in the same manner as another in a particular combination. Hence dependable conclusions as to new and unknown reactions can seldom be drawn, even if two elements belong to the same group. Thus, in Toledo Rex Spray Co. v. California Spray Chemical Co., 6 Cir., 268 F. 201, 204, in 1866 Bell and Fell obtained a patent for a process of making white lead by the direct action of nitric acid on lead oxide and addition of sulphuric acid. Later another patent issued for the process of making lead arsenate by the action of arsenic acid on nitrate of lead by direct precipitation. In sustaining this patent, the court said: "While in the light of the invention of the patent it may seem that it would naturally have occurred to one acquainted with the Bell & Fell disclosure to have tried the substitution of arsenic acid for sulphuric acid in making arsenate of lead, the fact remains that in the 40 years which elapsed since Bell & Fell it seems to have occurred to no one to try that experiment. In the light of this fact, and the further fact that mere analogy is not, in chemistry, usually so certain an index as in mechanics * * * we are not satisfied to say that it was within the expected skill of the chemist to know that Bell & Fell's process of making sulphate of lead * * * was equally available for producing arsenate of lead by the mere substitution of arsenic acid for sulphuric acid." See also Wold v. Thayer & Chandler, 7 Cir., 148 F. 227.

In Matthews Corp. v. Alliance Securities Co., 8 Cir., 40 F.2d 879, a patent for an air brush for spraying paint was held valid over one which disclosed a closely similar device for spraying petroleum in an oil burner· Lack of analogy was found to exist between tanning leather and dyeing fabrics in Tannage Patent Co. v. Zahn, 3 Cir., 70 F. 1003; between buffing or friction rolls and gear wheels in General Electric Co. v. Continental Fibre Co., 2 Cir., 256 F. 660; between use of granulated copper in a gas mask to absorb ammonia and use of the same material in a process of removing ammonia from illuminating gas during its process of manufacture in Yablick v. Protecto Safety Appliance Corp., 3 Cir., 21 F· 2d 885; between incubating eggs and drying tobacco in Smith v. Snow, 294 U.S. 1, 55 S.Ct. 279, 286, 79 L.Ed. 721, where the court said: "The Proctor & Knowles Patent * * * and the Schwartz Patent * * * of 1895, for methods and apparatus for conditioning tobacco and other materials, as well as other procedures for ventilation, are so remote from the problems and procedure for hatching eggs as to call for no comment."

█ It would seem obvious from the foregoing announcements that the District Court erred in its conclusion that the patentees were bound by the teachings of the prior art of Shipp. As we have seen, Shipp was dealing with a problem which arose in the manufacture of cotton cloth. Certain of such fabrics are advantageously disposed of in commerce when they bear a sheen· Shipp found that the concentrate used as a bath for such cloth, which had proved very treacherous in use, could be made less so by the addition of urea so that the material upon which the sheen was to be created could be bathed in the concentrate for as long as 60 seconds. The entire problem was one of finishing manufactured textiles. Shipp merely slowed up the disintegrating effect of the concentrate; he did not inhibit or bar it. Nor did he face the problem of retaining the beneficent acidic quality of a desirable antiperspirant while inhibiting corrosion. We think he was very far from any art analogous to that with which the present patentees were concerned. They were dealing with a cosmetic, a cream, the desired effect of which was to remove or to prevent perspiration. They found that the old combination tended to injure the skin by corrosive action and incidentally damaged the fabric of the clothing of the user. As the District Court found, the patentees' prescription of urea did not destroy the pH of the solution. They made no attempt to eliminate acidity by adding alkalies,—a discarded ineffective expedient, but they added urea, which is neutral in chemical reaction and which did not eliminate acidity but so acted as to prevent corrosiveness. This was their discovery. They were not concerned with prevention of decomposition of explosives, as was Schupphaus, or with preventing decomposition of and stabilizing aluminum salt solutions, as was Koch, or with preventing corrosion of cleaning fluids as was Missbach. Where others failed to cure the known defects of antiperspirants, these patentees succeeded; no one had taught the industry how to proceed until they made their disclosure.

Though the District Court grounded its decision upon the Shipp patent, defendant insists that an earlier solution of the patentees anticipates· The evidence tendered upon this issue was largely excluded because of its hearsay character or other infirmity. But even were it in the record, we think it insufficient to sustain the burden of proving the defense. The proportions of the elements of the solution were not shown; the compound was corrosive to cloth; apparently the acid consumed the urea. All in all, the most that is shown is one of the experimental steps of the patentees falling short of their final achievement. The proffered evidence as to the product "Negatan" we think equally insufficient to prove anticipation.

The finding that the claims, if valid, are infringed, is, we think, in full accord with the evidence.

The judgment is reversed with instructions to proceed in accord with the announcements herein.