### METAFRAME CORPORATION
### v.
### BIOZONICS CORPORATION.
### Civ. A. No. 70–1019.

United States District Court,
D. Massachusetts.

Dec. 7, 1972.

Abraham Friedman, New York City, for plaintiff.

David Wolf, Boston, Mass., for defendant.

RUBIN, * District Judge:

In a competitive struggle, almost as determined as that of two male betta splendens, or Siamese fighting fish, the manufacturers of concededly similar aquarium filtering devices, one the patent assignee, the other its challenger, here join battle to determine the validity of the patent. Since the patent is virtually conceded to possess utility, the victory turns on whether the two other legislative requisites [1] are met: whether the device was obvious at the time it was conceived to a person of ordinary skill in

---

* Visiting judge, sitting by special designation.

1. The Congressional authority to regulate patents is granted by U.S.Const. Art. 1, § 8, Cl. 8: "To promote the Progress of . . . useful Arts by securing for . . . Inventors the exclusive Right to their . . . Discoveries."

the art, and whether the concept was novel. The issues are clear, but the waters are deep.

Metaframe Corporation (Metaframe) acquired a patent originally issued to Allan H. Willinger, covering an aquarium filter apparatus, an embodiment of which has been marketed under the trademark "Dynaflo Motor Filter." Biozonics Corporation (Biozonics) is marketing a competing similar device, the Biozonics Filter, which it concedes would infringe claim 3 of the patent,[2] if it is valid. This claim, the only one involved in this suit, will be referred to as the Willinger patent.

## I. THE PROBLEM

The devices involved are used in home aquariums. Everyone has seen one kind or another of the conventional glass tanks for tropical fish. The fish must of course be fed. And they excrete waste. The remnants of food, the excreta, and other contaminants foul the water, making it not only less pleasant to view, but a threat to the health of the fish. Hence it is necessary to have some means to filter these impurities from the water.

Appliances to accomplish filtration by various means have been on the market for many years. Some were mounted outside the tank. Others worked from inside the tank, or from the bottom of the tank.

There were various problems in connection with each of the devices on the market. Some were expensive—too expensive for the average home hobbyist. Others used motors that caused noise or unpleasant vibration. Most of them required some maintenance from time to time.

## II. SEARCH FOR SOLUTION

Willinger had become interested in the aquarium hobby as a boy. He later worked for a manufacturer of aquarium heaters, eventually opened an aquarium shop, and finally became a manufacturer of aquarium supplies. He knew of the need for a filter that would be efficient, inexpensive, trouble-free, and reasonably quiet.

Reading an article about automobile speedometers in a magazine, Popular Mechanics, Willinger learned about magnetic coupling. This is a device by which a motor can drive a mechanism without a mechanical link. The driving mechanism moves a plate containing magnets. The down mechanism is linked to a plate containing magnets. When the two plates are placed near to each other the attraction of each set of magnets for the other compels the plates to move in unison; the plate in the driving mechanism turns the plate in the driven mechanism and its attachments.

The inherent virtue of this mechanism is that the driving and driven plates can be separated by a glass or plastic divider. The driven plate and its operating mechanism can thus be enclosed in a sealed unit without danger of contamination from outside substances. In the automobile speedometer, for example, the delicate mechanism that turns the gauge seen by the driver is in an enclosed unit. The sealed unit contains the driven plate, with its magnets; this is turned by a driving plate operated outside the unit. No dirt, dust, oil or water can enter the sealed speedometer. If there is a defect in the driving mechanism, it can be repaired without touching the sealed unit.

This principle had been used for other applications. Lunch counters frequently

---

**2.** By trial stipulation #6 the parties agreed "claims 1, 2, 4, 5 and 6 are not asserted against defendant with respect to Biozonics 3-Stage Aquarium Power Filter (35F) and model 520 Filter (35F520), and defendant does not contest the validity of those claims. Defendants admit the infringement of claim 3 by Biozonics 3-Stage Aquarium Power Filter (35F) and Model 520 filter (35F520) if that claim is held to be valid." June 8, 1972. Thus *only* the third claim of the six claims made by the Willinger patent #3,321,081 of May 23, 1967 is in issue. (filed June 18, 1964).

display juice dispensers in which orange juice or some other beverage is propelled in a spray around the walls of a clear plastic bowl. The customer is thus attracted by the sight of the foaming juice. The spray impeller keeps the juice aerated and foaming. In this application the liquid inside the bowl is sprayed by a pump operated through magnetic couplings by a driving plate and driving mechanism outside the juice container. The sealed container keeps the food product free from contamination, and divides the pumping mechanism into two physically separate units.

Willinger knew nothing of these other applications, nor had the magnetic coupling been used in this manner in the aquarium business. But the Popular Mechanics article directed his thought to an application for fish tanks. He was able to produce a model using parts readily available in the commercial market. Later he obtained the patent in suit.

## III. THE WILLINGER PATENT

Generally, the Willinger patent describes an aquarium filter apparatus that is hooked to an aquarium tank. Water is siphoned from the tank into the filter apparatus where it is cleaned; then it is returned to the tank. The water enters the filter device from the top. The filter material, e. g. charcoal, is placed on a horizontal divider in the chamber. The water flows down by gravity, filters through this material and passes into a clean water chamber. A centrifugal pump, supported in the divider, returns the filtered water to the aquarium tank through a water outlet.

The centrifugal pump is operated by an electric motor that is coupled to it magnetically. The pump itself is located outside the aquarium tank, but inside the filter device. Beneath the impermeable bottom wall of the filter device outside of the fish tank is a driving magnet, directly connected to the electric motor. Thus the motor turns the driving magnet, and the driving magnet turns the driven magnet, motivating the pump. In this way, the water cannot be contaminated by oil or foreign material from the driving magnet or motor.

The similarity of the Willinger device to the Biozonics filter caused this suit for infringement to be filed. Because Biozonics confesses the similarity, the single issue is the validity of the Willinger patent.

## IV. OBVIOUSNESS

One of the three tests for patent validity is that the device not be "obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103. This requirement of validity was codified by statute in the Patent Act of 1952, but the identical test existed jurisprudentially many years before. The Court had in Hotchkiss v. Greenwood, 1851, 11 How. 248, 13 L.Ed. 683, laid the foundation for the test of obviousness. The Court stated:

"[U]nless more ingenuity and skill * * * were required * * * than were possessed by an ordinary mechanic acquainted with the business, there was an absence of that degree of skill and ingenuity which constitute essential elements of every invention. *In other words, the improvement is the work of the skilful mechanic, not that of the inventor.*" At p. 267. (emphasis added)

The 1952 Act did not come before the Supreme Court for interpretation until fifteen years after its enactment, in Graham v. John Deere & Co., 1966, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545. The Court there referred to the Hotchkiss test of 1851:

"The Hotchkiss formulation" the court stated, "however lies not in any label, but in its functional approach to questions of patentability." The adoption of § 103 did not change the standards for patentable invention, but rather was "merely as a codification of judicial precedents embracing the Hotchkiss condition . . . ." *Graham, supra* at 693.

■ The three steps in applying section 103 were also formulated in *Graham.* "The scope and content of the prior art are to be determined; the differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved." *Graham, supra* at 694. Strict observance of this analysis is required. Anderson's Black Rock v. Pavement Salvage Co., 1969, 396 U.S. 57, 90 S.Ct. 305, 308, 24 L.Ed.2d 258.

■■ The validity of a patent is ultimately an issue of law because it is a decision of the legal status of the idea embodied in a document issued by the patent office. But "the determinations underlying the question of obviousness are essentially factual ones primarily entrusted to the district court." Nashua Corp. v. RCA Corp., 1st Cir. 1970, 431 F.2d 220; Koppers Co. v. Foster Grant Co., 1st Cir., 1968, 396 F.2d 370.[3] See also *Graham, supra,* 86 S.Ct. at 694; Great A. & P. Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, at 151, 71 S.Ct. 127, at 131, 95 L.Ed. 162. And, in the decision of those factual issues, the application of the "non-obviousness" test must necessarily proceed on a case-by-case basis with the continuous development of a body of jurisprudence. *Graham, supra* 86 S.Ct. at 694.

### V. THE PRIOR ART

Prior to the development of the Willinger patent, magnetic coupling devices were in common use. Thus, a driven and driving magnet on opposite sides of a fluid impermeable wall had been used to couple a motor to a pump-impeller for pumping fruit juices and similar beverages;[4] for deep well pumps and power transmission arrangements;[5] for gas and fuel pumps;[6] for refrigeration systems;[7] for chemical and dairy pumps;[8] and for centrifugal pumps generally.[9] The use of an open tank raising water by siphon, aerobic filtration by charcoal, employing gravity for filtration—all of these were likewise in common use. Willinger's patent consists of a combination of these previously existing elements.

There are two other patents of special importance: Canterbury and Supreme. The Canterbury patent was filed on October 2, 1963, more than eight months before Willinger's application. It was issued in September, 1966, at which time it was made public; the Willinger patent was issued on May 23, 1967.

Canterbury incorporated a magnetic coupling device into an aquarium pump, although it utilized a sealed suction system, rather than the unsealed, open-topped, siphon fed, aerobic filtration of Dynaflo. Available records indicate that the examiner was aware of the Canterbury patent during the course of prosecution of the Willinger application, but there is no evidence that Willinger or his attorney at that time attempted to establish an invention date prior to the filing of Canterbury.

The relevance of Canterbury is contested because, though Canterbury was filed prior to Willinger, Willinger asserts that his conception and reduction to practice occurred prior to the filing date of Canterbury. His testimony in this re-

---

3. "[W]hether a discovery of a new combination is or is not obvious must be a question of fact." *Koppers, supra* 396 F.2d at 372: See also Van Gorp Mfg. Inc. v. Townley Industrial Plastics, Inc., 5th Cir., 1972, 464 F.2d 16, where the court stated: "The district courts incorrectly treated the question of novelty solely as one of law without proper consideration of pertinent factual background . . . . [A]nticipation or lack of novelty is largely a question of fact."

4. Jacobs [Jet Spray] patents 2,745,641 and 3,119,531 and Mould patent 3,045,134.

5. Rankin patent 2,638,558.

6. Fay patent 591,395 and Cassassa patent 2,951,447.

7. Schug patent 2,366,562.

8. Akulitch patent 2,669,668.

9. Baratz patent 3,172,464 and Tabor patent 1,982,971.

gard is uncorroborated, and Biozonics contends it should not be credited.

It is unnecessary to consider and resolve the questions of burden of proof, presumptions of priority, and the availability of procedures within the patent office to resolve such conflicts, because the questions of obviousness and novelty here may be determined without reference to Canterbury.[10]

The narrow question of whether Canterbury is prior art in the literal sense is not decisive. The prior art utilizing magnetically driven pumps is exemplified in a host of other applications already noted. Hence, even if Canterbury is not prior art, its application of the magnetic clutch principle demonstrates that the knowledge of such a possible use was gaining currency even in aquarium devices.

Supreme, which unquestionably issued years prior to Willinger, was for an aquarium filter essentially identical to the Dynaflo filter except that Supreme secured the electric motor above the filter receptacle and coupled it directly rather than by magnetic couplings to the centrifugal pump. Both Supreme and Willinger utilize a filter receptable fed from the tank by a tube. Both employ a divider separating the filter with a filtration chamber and a clean water chamber with apertures in the divider allowing the flow of water, though Supreme permits some mixture of contaminated water with filtered water, and both are powered by electric motors which drive the impeller of the centrifugal pump. Though Supreme was not commercially popular because of its expense, and because of vibration difficulties, it is part of the prior art considered here. The acknowledgment of prior developments is implicit in the plaintiff's position that his invention lies not in the development of any element of his combination, but rather in the novelty of the combination.

## VI. THE BURDEN OF PROOF

 A patent, having run the gamut of registration, is presumed to be valid. 35 U.S.C.A. § 282. The burden of proving its invalidity is on the challenging party. Ibid. Mr. Justice Cardozo analyzed the force of the presumption and the burden of proof it created in Radio Corp. of America v. Radio Engineering Laboratories, 1934, 239 U.S. 1, 7, 55 S.Ct. 928, 79 L.Ed. 163.

Since the evidence is so clear here that there need be no nice balancing of the scales with respect to the burden of proof, we need not concern ourselves with the argument that Willinger's failure to disclose Supreme reduces Biozonics' burden. Instead, we assume that the RCA rule applies.

## VII. THE ART TO WHICH THE SUBJECT MATTER PERTAINS: HEREIN OF THE ALLEGED DIFFERENCES BETWEEN THE ART AND THE CLAIMS AT ISSUE

The area of dispute between the parties is narrower than the general question of obviousness. Their basic controversy is in the definition of the "art" to which Section 103 refers. Metaframe and Willinger both concede that engineers were well acquainted with magnetic couplings; they assert that Willinger's inventiveness lay in devising the first use of such a device in aquarium filters, arguing that this drive mechanism was not known in the aquarium industry.

Though the standard of obviousness has remained the same since *Hotchkiss*,

---

10. Thus the court does not reach the defendant's assertions that the plaintiff has a substantial burden of proof to carry back a date of invention beyond the filing date of an earlier filed application; Syracuse v. H. Daust Mfg. Co., 8th Cir. 1960, 280 F.2d 377; United Shoe Machinery Corp. v. Brooklyn Wood Heel Corp., 2nd Cir. 1935, 77 F.2d 263; and that ordinarily uncorroborated evidence of a patentee is insufficient to establish an earlier date. See Monaplastics Inc. v. Caldor, Inc., 2nd Cir. 1967, 378 F.2d 20; Rooted Hair, Inc. v. Ideal Toy Corp., 2nd Cir. 1964, 329 F.2d 761.

the rapid technological advances of this century have resulted in a widening of the "ambit of [the] applicable art in given fields of science . . . .[11]

In the present case, pretermitting Canterbury for the moment, a preponderance of the evidence establishes that no one had used magnetic couplings for aquarium filters before Willinger. But this manner of operating a pump was well known to mechanical engineers. Indeed Willinger at all times asserted the invention to reside in the novel combination and not in the elements of the combination.

The elements to assemble the device were commercially available; the theory was widely applied. This application would have been obvious to a person with mechanical engineering training in 1960. Indeed, there was testimony by a witness who satisfied the court as being both expert and reliable that the problem would have been too elementary for him to assign to an undergraduate mechanical engineering class if he were seeking to require them to develop a creative application. It is unchallenged that if the applicable art is "fluid dynamics" the application of the magnetic coupling would have been obvious to the ordinary person in that field.

Is the Section 103 test then the obviousness of an application to persons working in a particular field, such as the aquarium trade? Or does the test apply to persons having ordinary skill in the basic mechanical or scientific field, such as fluid dynamics, even though they are not actually working in a particular field that might call forth their skill? The answer to this question cannot be drawn explicitly from the jurisprudence or the texts cited by counsel. Yet the principle seems clear, and it may be drawn implicitly from the jurisprudence.

The factual decision in *Graham* supports a conclusion of obviousness here. In *Graham*, the validity of the Scoggin patent was in issue. Scoggin had developed a finger-pumped spray container, primarily for use in bottling household insecticides. Scoggin used a sealing technique similar to the Livingston patent, the prior art. The court decided, "Cook Chemical [owner of Scoggin] argues, however, that Livingston is not in the *pertinent* prior art because it relates to liquid containers having *pouring spouts* rather than pump sprayers . . . . [S]o restricted a view of the *applicable* prior art is not justified. *The problems confronting Scoggin and the insecticide industry were not insecticide problems; they were mechanical closure problems.* Closure devices in such a closely related art as pouring spouts for liquid *containers are at the very least pertinent references."* at p. 703. (emphasis added).

Hence, the adaptation of a device previously utilized to pump orange juice to use in pumping water so that it would return to a tank after passing through a charcoal filter would not satisfy the test of invention.

The same conclusion results from examination of Cuno Engineering Corp. v. Automatic Devices, 1971, 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed.2d 474. There, the patentee's contribution was to apply a thermostatic control unit, found in electric heaters, flat irons, electric coffee makers, and toasters, to an automobile cigar lighter. The court concluded this was not invention, because the adaptation would be obvious to an ordinary person skilled in the art. The court considered the relevant art to be that of thermostatically controlled heating units, and not the art of lighting cigars in automobiles. At p. 41 the court stated:

"Certainly the use of a thermostat to break a circuit in a 'wireless' cigar

---

11. "The standard [for obviousness] has remained invariable in this Court. Technology, however, has advanced and with remarkable rapidity in the last 50 years. Moreover, the ambit of applicable art in given fields of science has widened by dis-

ciplines unheard of a half century ago. It is but an evenhanded application to require that those persons granted the benefit of a patent monopoly be charged with an awareness of these changed conditions." *Graham, supra,* 86 S.Ct. at 695.

lighter is analogous to or the same in character as the use of such a device in electric heaters, toasters, or irons, whatever may be the difference in detail of design. *Ingenuity was required to effect the adaptation, but no more than that to be expected of a mechanic skilled in the art."* at p. 41.

"Strict application of that test is necessary lest in the constant demand for new appliances the heavy hand of tribute be laid on each slight technological advance in an art. The consequences of the alternative course were forcefully pointed out by Mr. Justice Bradley in Atlantic Works v. Brady, 107 U.S. 192, 17 Otto 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438: 'Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention. It creates a class of speculative schemers who make it their business to watch the advancing wave of improvement, and gather its foam in the form of patented monopolies, which enable them to lay a heavy tax upon the industry of the country, without contributing anything to the real advancement of the art. It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities to lawsuits and vexatious accountings for profits made in good faith.' Cf. Mr. Justice Campbell dissenting in Winans v. Denmead, 15 How. 330, 344, 345, 347, 14 L.Ed. 717; Hamilton, Patents and Free Enterprise, Mon. No. 31, Investigation of Concentration of Economic Power, Temporary National Economic Committee, 76th Cong., 3d Sess., ch. VIII (1941).

*"Such considerations prevent any relaxation of the rule of the Hotchkiss case as respondent would seem to desire.*

"Reversed." (emphasis added) [12]

Similarly, in Mandel Bros. v. Wallace, 1948, 335 U.S. 291, 69 S.Ct. 73, 93 L.Ed. 12, the plaintiff claimed a patent on a new type of anti-perspirant, which solved problems of corrosion of cloth and irritation of skin by the addition of urea. Plaintiff was clearly the first person ever to use urea as an anti-corrosive agent in an anti-perspirant, but urea had previously been used by others for the same purpose in other products. Prior to plaintiff's patent it was generally known to chemists that urea would react with acids to reduce their corrosiveness. Urea had previously been used as a stabilizer against decomposition into acid, and was also used to protect clothing from the effect of dry cleaning fluid.

In *Mandel* the Supreme Court reversed the holding of the Seventh Circuit Court of Appeal, Wallace v. Mandel Bros. Inc., 1947, 164 F.2d 861. That court had referred to cases finding a lack of analogy between stopping leaks in hot water systems and stopping leaks in automobile tires; making chocolate drops and freezing ice cubes; the use of air brushes for spraying paint and the spraying of petroleum in an oil burner; tanning leather and dying fabrics; incubating eggs and drying tobacco; and the use of copper in a gas mask to absorb ammonia and its use for the same purpose in illuminating gas. The Supreme Court was silent on the merit of these previous decisions, but was unpersuaded by the lower court's recitation of them. It said, pp. 75–76.

"[T]he position taken by the United States Court of Appeals in this [was] that the cosmetic problem here was remote and unrelated to the problems considered in the prior art. For this reason that court held that patentees in the field of cosmetics were not bound by prior art knowledge disclosed by the Shipp and other patents. The court therefore considered this patent almost as though patentees were writing on a clean sheet. Accordingly it held that the use of urea in the cosmetics field with the results

---

12. We note especially in *Cuno* the court's reaffirmation of the "functional" approach of the *Hotchkiss* case.

here obtained were patentable invention.

"In this the court was in error. As we have pointed out, the general store of chemical knowledge in 1938 was such that any one working on any problem of acidic corrosion and irritation would naturally and spontaneously have tried urea. All that these patentees did was to utilize in a cosmetic preparation, publicly available knowledge that urea would inhibit acidic corrosion. The step taken by the patentees in advance of past knowledge was too short to amount to invention. They merely applied an old process of inhibition to a new cosmetic use. This is not invention. Dow Chemical Co. v. Halliburton Oil Well Cementing Co., 324 U.S. 320, 327, 65 S.Ct. 647, 650, 89 L.Ed. 973."

Again the court suggests that the relevant art is chemistry, not the manufacture of anti-perspirants. Here fluid dynamics is the functional art involved, not the movement of water in fish aquariums.

A fourth related precedent is Concrete Appliances Co. v. Gomery, 1925, 269 U.S. 177, 46 S.Ct. 42, 70 L.Ed. 222. The plaintiff had patented a "material transferring apparatus" designed to move wet concrete during construction to specific working areas. Similar gravitational devices had been used to transfer water, grain, coal, crushed stone, sand, and iron ore. Related devices had previously been developed to transfer wet concrete, but the court emphasized the prior use of the principle in connection with other substances. Id. at 45. This was the application of mere mechanical skill, not invention. The art to be considered was knowledge relative to the distribution of materials through use of gravity, not materials handling in the limited field of cement distribution or construction.

Though this jurisprudence does not explicitly develop a definition of "prior art", it is clear by extrapolation that the pertinent "art" is the functional, conceptual or generic art, not the knowledge of artisans in the separate commercial areas wherein diverse products are sold.

Further the term "art" in § 103 extends not only to the "pertinent art", but also to "knowledge from other arts reasonably pertinent to his particular problem . . . ." In re Antle, C.C.P.A. 1971, 444 F.2d 1168, 1171–1172, and to any "analogous art". Buffalo-Springfield Roller Co. v. The Galion Iron Works Mfg. Co., 6th Cir. 1954, 215 F.2d 686; Allied Wheel Products Inc. v. Rude, 6th Cir. 1953, 206 F.2d 752. "If the elements and purposes in one art are related and similar to those in another art, and because and by reason of that relation and similarity make an appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then . . . such arts must be said to be analogous . . . ." Wallace v. Mandel Bros., Inc., 7th Cir., 1947, 164 F.2d 861.

Thus, Willinger is unquestionably charged with knowledge in the pertinent art, and furthermore, the court must "presume . . . [his] ability to select and utilize knowledge from other arts reasonably pertinent to his particular problem which would be expected of a man of ordinary skill in the art to which the subject matter pertains." In re Antle, C.C.P.A.1971, 444 F.2d 1168. Furthermore, prior art includes pending applications for patents yet unissued and unpublic. Hazeltine Research, Inc. v. Brenner, 1965, 382 U.S. 252, 86 S.Ct. 335, 15 L.Ed.2d 304. Hence, it appears that the prior art should be defined to embrace those of ordinary skill in a particular industry or field of application and those related professions to which they might ordinarily be expected to turn in the normal course of problem solution.

The adaptation of a magnetic coupling to an aquarium pump would have seemed elementary to one with ordinary skill in the field of fluid dynamics. Here the original patentee, Willinger, had no experience or training in that area, but this does not restrict the test of obviousness,

which presumes that "the inventor would have that ability to select and utilize knowledge from other arts reasonably pertinent to his particular problem which would be expected of a man of ordinary skill in the art to which the subject matter pertains." Application of Antle, C.C.P.A. 1971, 444 F.2d 1168, 1172. *Accord,* Burgess Cellulose Co. v. Wood Felong Corp., 2nd Cir. 1970, 431 F.2d 505, at 509. "All inventors, regardless of their personal skills, are held to this [§ 103] statutory standard." Application of Warner, C.C.P.A. 1967, 379 F.2d 1011.[13]

By this time the conclusion already reached need only be put in definitive words: the Willinger concept was obvious to one with ordinary skill in the applicable art. The combination it made was merely the intelligent use of mechanical ability to continue a previously existing magnetic coupling to the previously existing elements of an electric motor powering a centrifugal pump, an open top filter receptacle with a siphon tube, and a divided filter action chamber. Various minor issues are of no significance: The argument that water pumped from Willinger's unit is clearer because of the divided chamber ignores the fact that the small filtration device processes only water taken from and returned to a contaminated source; the suggestion that it "polishes" the water is merely a result of relative efficiency of the filtration process and rapidity of the cycle. None of these is the result of any inventive combination.

13. "We think those of ordinary skill in the cosmetic pencil art, faced with the problem of maintaining a point on such a pencil, would be aware of or reasonably turn to the crayon art for the solution to this problem. In short, we do not find that the nonanalogous art doctrine excludes [these] teachings . . . . " *Id.* at 1014. Cf. Application of Mariani, C.C.P.A.1949, 177 F.2d 293, where validity was denied for a fruit juice extractor because of prior patents relating to fishing reels and automobile jacks. The court approved of the patent office conclusion that even if these patents were in nonanalogous arts, the adaptation of those

## VIII. NOVELTY

Willinger's is a combination patent. It is conceded that all of its elements had long been known, but it is asserted that the invention lies in the novelty of the combination. Such a patent must of course satisfy the Section 102 test for novelty, 35 U.S.C. § 102. In the area of combination patents, the examination of a patent for novelty involves the consideration of many facts identical to those weighed in determining nonobviousness, but these tests are discrete in the statute.

"Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." Great A. & P. Tea Co. v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. To be patentable, an invention must be not merely a "novel use", but must be a "novel conception." Beckman Instrument Co. v. Chemtronics, Inc., 5th Cir. 1970, 428 F.2d 555, 561. Without more, a new combination of old elements, or an application of an old process to a new use is not invention. A patent must represent more than a routine advance in its field in order to be entitled to the patent monopoly.

"The function of a patent is to add to the sum of useful knowledge," the court said in Great A. & P. Tea Company v. Supermarket Equipment Corp., 1950, 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162. "Patents cannot be sustained when, on the contrary, their ef-

features involved "only an obvious exercise of ordinary mechanical skill . . . . " See also in re Kylstra, C.C.P.A.1937, 87 F.2d 489; where a patent was denied for a device which counted the number of rounds fired by a machine gun. The basis for invalidity was a prior patent on a similar counter attached to street car wheels to determine the distance travelled. The "art" involved was not weaponry or mass transportation, rather "the actual *art* is numbering or counting . . . and we regard such *art* as being the same in both the device of [the patentee and the prior patent]." *Id.* at 488.

fect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions, obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men."

In *Graham*, the court quotes Thomas Jefferson: "A machine of which we are possessed might be applied by every man to any use of which it is susceptible," that is, a new use alone is not entitled to the patent monopoly.[14] Beckman Instruments, Inc. v. Chemtronics, 5th Cir. 1970, 428 F.2d 555, 561, n. 9. Similarly one who is truly an inventor is entitled to all of the uses of his invention, even though some of them were not foreseen by him.

In C. & A. Potts & Co. v. Creager, 1895, 155 U.S. 597, 15 S.Ct. 198, 39 L.Ed. 275, the court dealt with the recurrent problem of distinguishing between an invention and a mere new use:

"[W]here the alleged novelty consists in transferring a device from one branch of industry to another, the answer depends upon a variety of considerations. In such cases we are bound to inquire into the remoteness of relationship of the two industries, what alterations were necessary to adapt the device to its new use, and what the value of such adaptation has been to the new industry. If the new use be analogous to the former one, the court will undoubtedly be disposed to construe the patent more strictly, and to require clearer proof of the exercise of the inventive faculty in adapting it to the new use, particularly if the device be one of minor importance in its new field of usefulness. On the other hand, if the transfer be to a branch of industry but remotely allied to the other, and the effect of such transfer has been made to supersede other methods of doing the same work, the court will look with a less critical eye

upon the means employed in making the transfer . . . . If, for instance, a person were to take a coffee mill and patent it as a mill for grinding spices, the double use would be too manifest for serious argument. So, too, this court has denied invention to one who applied the principle of an ice-cream freezer to the preservation of fish (Brown v. Piper, 91 U.S. 37, [23 L.Ed. 200]); to another who changed the proportions of a refrigerator in such manner as to utilize the descending instead of the ascending current of cold air (Roberts v. Ryer, 91 U.S. 150, [23 L.Ed. 267]); to another who employed an old and well-known method of attaching car trucks to the forward truck of a locomotive engine (Pennsylvania R. Co. v. Locomotive Engine Safety Truck Co., 110 U.S. 400, 4 Sup.Ct. 220, [28 L.Ed. 222]); and to still another who placed a dredging screw at the stem instead of the stern of a steamboat (Atlantic Works v. Brady, 107 U.S. 192, 2 Sup.Ct. 225, [27 L.Ed. 438]). . . .

. . . . . .

"As a result of the authorities upon this subject, it may be said that, if the new use be so nearly analogous to the former one that the applicability of the device to its new use would occur to a person of ordinary mechanical skill, it is only a case of double use; but . . especially if the use of the old device produce a new result, it may at least involve an exercise of the inventive faculty. Much, however, must still depend upon the nature of the changes required to adapt the device to its new use."

In all the instances cited in *Potts*, just as in this case, something can be said for either side of the issue. The question of novelty, being one of judgment, is necessarily not susceptible of precise determination. But there appears to be such a close relation between the prior application of magnetically driven pumps

---

14. T. Jefferson, Letter to Isaac McPherson, in Writings of Thomas Jefferson, 180– 181; *Graham, supra*, 86 S.Ct. at 690, n. 3.

to the Willinger use that his concept lacks the requisite novelty.

## IX. SUB-TESTS OF PATENTABILITY

At least in part because of the judiciary's general lack of expertise in the scientific, mechanical, and technological areas wherein patents are sought,[15] the jurisprudence relating to patentability has approvingly adopted subtests of validity that look to motivation for the improvement and its economic results. In *Graham* the court suggested two such tests: longfelt demand and commercial success. Other courts have looked to commercial acquiescence, professional approval, and successful patent application. See Note, 112 U.Pa.L.Rev. 1169 (1964). But, notwithstanding these secondary criteria, there can be no valid patent unless there is invention. Anderson's Black Rock v. Pavement Storage Co., 1969, 396 U.S. 57, 90 S.Ct. 305, 308, 24 L.Ed.2d 258; Great A. & P. Co. v. Supermarket Corp., 1950, 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162. Both in *Graham* and *Anderson's Black Rock*, despite commercial success, the court found the patents to be invalid. See also Reiner v. I. Leon Co., 2nd Cir. 1960, 285 F.2d 501, 503–504. The need for a better aquarium filter and the commercial success of Willinger's patent do not outweigh the primary findings of obviousness and lack of novelty.

## X. ESTOPPEL

 Biozonics applied for and obtained a patent similar to Willinger's. It cannot be gainsaid that this position is inconsistent with its present assertion of the invalidity of the earlier patent.

The facts alleged in a patent application are relevant where a later inconsistent position is taken. Haughey v. Lee, 1894, 151 U.S. 282, 285, 14 S.Ct. 331, 38 L.Ed. 162. Cf. Paramount Corp. v. Tri-Ergon Corp., 1935, 294 U.S. 464, 476.[16] See also LaSalle St. Press v. McCormick & Henderson, 7th Cir. 1971, 445 F.2d 84, where the defendant received a patent similar to plaintiff's during the pendency of an infringement action.[17] But inconsistency in patent law is no more conclusive than in Emerson's philosophy.[18] It is to be considered, but like the economic and motivational subtests announced by the court in *Graham*, it is not per se dispositive of patent validity, only one of many relevant factors. There is no estoppel here, because there is no evidence of detrimental reliance on Dynaflo's position. The public interest in protecting the patent monopoly from improper appropriation is stronger than the policy that frowns on those who seek always to turn their faces to the sun and to adopt the position that this day favors their interest. For these reasons, the defendant's application does not bar an attack upon Dynaflo.

## XI. ATTORNEY'S FEES

 The Supreme patent, argues the defendant, is identical to Dynaflo, except for the magnetic coupling, and thus should have been cited to the patent office in the Willinger application. The effect of the absence of this reference, says the defendant, diminishes the presumption of validity of the Willinger patent, and entitles the defendant to attorney's fees. "The court in exceptional cases may award reasonable attorney

---

15. Compare the observation of Judge Learned Hand that the question of invention presents an issue that is as "fugitive, impalpable, wayward, and vague a phantom as exists in the whole paraphernalia of legal concepts." Harries v. Air King, 2nd Cir. 1950, 183 F.2d 158.

16. There the defendant, who applied for and was refused a patent 7 years prior to the issuance of a patent to plaintiff, was

held not estopped to challenge the validity of plaintiff's patent.

17. Thus, *Haughey* was differentiated from *LaSalle*, a case of contemporaneous inconsistent positions.

18. "A foolish consistency is the hobgoblin of little minds, adored by little statesmen and philosophers and divines" Emerson, "Self-Reliance," *Essays: First Series* (1841).

**1018**

fees to the prevailing party." 35 U.S.C. § 285. This is not such a case.

The absence of citation of the prior Supreme filter was not such an act of bad faith as to justify attorney's fees in this case though Willinger was aware of Supreme. At the time Willinger developed his pump, the Supreme unit was not commercially significant. It was an expensive pump that Willinger himself had never carried in his shop. Furthermore, Willinger's was an air operated filter in contrast to Supreme's power operation, which provided the requisite circulation directly by means of an electric motor physically coupled to a centrifugal pump. But there were many common elements.

Though Supreme was prior art, relevant to the issues of obviousness and novelty, Willinger's omission of it as a reference was not motivated by an intent to deceive or mislead, or by lack of good faith. "[A]n applicant has no duty to cite every publication of which he knows . . . . merely because the publication is one likely to be referred to by a vigilant examiner in the Patent Office or by a rival in an interference or other proceeding. It is not the object of the quoted statute 'patentee's oath of belief of invention] . . . to force the applicant to set up what he regards in good faith as straw men which he reasonably and in good faith believes he can knock down." United States v. The Standard Electric Time Co., D.C.Mass. 1957, 155 F.Supp. 949.

For these reasons, judgment will be rendered declaring Claim III of the Willinger patent invalid, but rejecting defendant's demand for attorney's fees. Counsel for defendant will prepare an appropriate form of judgment and submit it to counsel for Metaframe as well as the court. Counsel for Metaframe will note either approval as to form or state its objections and the reasons therefor.