**NOVELART MANUFACTURING COMPANY, Plaintiff,**

v.

**CARLIN CONTAINER CORP., and Continental Packaging Corp., Defendants.**

**Civ. A. No. 826–70.**

United States District Court,
D. New Jersey.
June 12, 1973.

Crummy, O'Neill, Del Deo & Dolan, by Peter E. Henry, Newark, N. J., Wood, Herron & Evans, by William G. Konold, Donald F. Frei, Cincinnati, Ohio, for plaintiff.

Pitney, Hardin & Kipp, by William H. Hyatt, Jr., Newark, N. J., Kenyon & Kenyon, Reilly, Carr & Chapin, by John A. Reilly, Albert J. Breneisen, New York City, for defendants.

### OPINION

LACEY, District Judge:

This is an action for infringement by the assignee of United States Patent No. 3,306,805 (hereinafter called plaintiff's patent or the Klein patent), issued on February 28, 1967, for an Apparatus for Making Printed Corrugated Paper Board, on an application filed in the United States Patent Office on May 20, 1963.

Plaintiff is a Delaware corporation, having its principal place of business in Cincinnati, Ohio.

The defendants Carlin Container Corp. (Carlin) and Continental Packaging Corp. (Continental) are New Jersey corporations, having their principal places of business in Roselle, New Jersey, and Kenilworth, New Jersey, respectively.

This action was tried to the Court on the issues of validity, infringement, and unfair competition. Subject matter jurisdiction is had over plaintiff's patent infringement claim by virtue of 28 U.S.C. § 1338(a), and venue thereof is properly laid in this Court under 28 U.S.C. § 1400(b). Jurisdiction also exists over defendants' declaratory judgment counterclaim for invalidity and non-infringement, 28 U.S.C. § 1338, and over defendants' unfair competition counterclaim, pursuant to 28 U.S.C. § 1338(b).[1]

---

1. Defendants also assert that the Claim, infringement of which is alleged, Claim 2, calls for an inoperative structure (35 U.S.C. § 112); fails to disclose the "best mode contemplated by the inventor of carrying out his invention" (35 U.S.C. § 112); is invalid for indefiniteness (35 U.S.C. § 112); was obtained by misrepre-

The patented apparatus, which will of course be detailed hereinafter, is used to make printed and pictorial double face corrugated paperboard, commonly used in decorative cartons for packaging of consumer products.

The apparatus accused by plaintiff of infringing the patent in suit is owned and operated by defendant Carlin, which sells corrugated boxes but not machinery. Defendant Continental, among other things, owns the premises where the accused apparatus is installed, leases space to Carlin, and is a stockholder in Carlin.

This matter was tried before me over thirteen trial days, following which the parties submitted post-trial briefs and proposed findings of fact and conclusions of law.

The opinion which follows embodies my own findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## INDUSTRY BACKGROUND

Comprehension of the issues requires a knowledge of the packaging industry, and, more particularly, corrugated box manufacturing.

The corrugated box, long useful but unattractive, is familiar to all. In its conventional form it consists of two flat layers adherent to a "fluted" or corrugated layer sandwiched between them. The resultant three-ply product is called "double face corrugated web" or "double face corrugated board," or simply, "double face." A "web" is a continuous piece, rather than a separate sheet, coming off a huge roll, and can be even miles long. A web is to be distinguished from a "sheet," which, as dealt with herein, is a piece that at its maximum will be about 6 feet long.

The conventional machine for manufacturing double face corrugated board first takes a web of single-ply paperboard, corrugates it, and then weds it to a flat web of single-ply paperboard by gluing them together (at the point of adherence between the peaks of the corrugated board and the flat web surface) and passing them as one unit through a pair of rollers. The result, accomplished by apparatus called a single facer, is called single face corrugated paperboard, having a single-ply facing sheet and a single-ply corrugated sheet. In the next step, the single face corrugated board is led, with the flutes down, to a glue station where glue is placed on the tips of the flutes. A second flat web of single-ply paperboard is then led off a roll and made adherent to the adhesive coated corrugated layer; thereafter the entire product is passed through another set of rollers, in an apparatus called a double facer, which by pressure completes the adhering process. The product is the aforesaid double face corrugated paperboard.[2]

For at least two decades preceding 1964, corrugated box manufacturers had devoted attention to improving the outside appearance of the corrugated box. Against this historical background, Eugene E. Macchi, President of defendant Continental, wrote in 1964 (Macchi, Pre-Printed Liners—Progress and Problems, "Board PackAge," May 1964):

. . . No longer is it enough that a brown Kraft corrugated box protect

sentations to the Patent Office; and that plaintiff was guilty of improper practices which disentitle it to equitable relief.

2. There are other types of corrugated products which warrant description. One incorporates two separate corrugated layers, and is termed "double wall." It is made by adhesively joining, on a continuous basis, in conventional corrugating equipment, two webs of single face and a web of single-ply liner, with the corrugation flutes of single face parallel to each other and transverse to the longitudinal direction of the webs, thereby producing a five-ply product of a strength and thickness greatly exceeding that of conventional double face corrugated board. Conventional "double wall" board can be strengthened further if the corrugation flutes of the two corrugated mediums are perpendicular to each other, producing what is known as "cross-fluted" double wall. "Double wall" paperboard becomes significant in the context of this case because of certain prior art urged by defendants as controlling on the issue of obviousness under 35 U.S.C. § 103.

the product and insure that it reaches the customer in one piece. Now, the package must also be the point-of-purchase attention getter that first attracts the attention of the purchaser

. . . .

\* \* \* \* \* \*

Somehow a way, or ways, must be found to economically reproduce on to-day's much improved paperboards, the more sophisticated graphic design and more appealing reproductions which are characterized by other forms of packaging.

Prior to 1964, corrugated box manufacturers had used several approaches in placing printing or pictorial displays on corrugated box exteriors. One was to print directly on the completed board, but the quality of the printing was poor, due in part at least to the uneven surface of the board. Another approach was laminating or "label pasting," first printing a separate sheet, and then adhering it to a completed double face board. In addition to other faults, this method was too expensive.

Still another approach was to preprint on a web of paperboard, and then feed it into the corrugating machine as one of the two faces of the double face board. This preprinting, however, as performed, also was beset with problems.[3]

There were, and are, what the aforesaid Macchi article styled "three popular approaches to preprinting [on web for] corrugated box liners". The lithographic method produces a high quality printing. However, the offset nature of the lithographic presses limits the reproduction on any press to the fixed circumference of the printing cylinder. Thus, if the cylinder has a 44″ circumference, and the job to be run has a 40″ length, each reproduction results in a 4″ waste which must later be trimmed from each corrugated web, a wasteful operation. See File Wrapper on Klein Patent, 1 (DX–1), wherein plaintiff's patent application, in 1963, sets forth the same problem.

The rotogravure method too produces printing of good quality, but involves heavy costs of setting up equipment.

3. See Application of Messrs. Plunkett (President of Carlin) and Bradshaw in 1969 for a patent, wherein they refer to "these disadvantages," a reference to printing on liners of web rather than discrete sheets, and to how "these disadvantages were overcome by sequentially bonding a series of preprinted sheets onto a moving web of material formed of a single flat sheet and an overlying corrugated sheet. The series of preprinted sheets have been supplied to the moving stream by moving a number of sheets in overlapping relation at a speed synchronized with the speed of the moving stream." This is obviously a description of the Klein concept.

The accused apparatus preprints, like Klein's patented apparatus, on sheets, not web, and feeds them onto a moving single face. To that extent, at least, the plaintiff can claim that Messrs. Plunkett and Bradshaw, experienced in the corrugated industry, saw that the preprinted sheet concept presented advantages over preprinting on web. See Plunkett TR 1115:

. In 1962 I formed the opinion that preprinted corrugated products would have a better market if they could be produced with a top liner that had been sheet fed printed. I determined in my mind at this point to try to develop a method whereby this could be successfully done. A fair degree of my spare time in this period was spent in thinking or looking at other machinery to see if I couldn't come up with a novel approach to making the desired product.

In the summer of 1966 I conceived of a method . . . .

This method was sheet feeding (TR 1116, et seq.). Plunkett also testified as to advantages of preprinting on sheets as against web (TR 1129–30). He felt he was "carving out new territory at this time." (TR 1142). Asked about the Macchi article, he stated (TR 1116):

I did not study this well enough to make any comment on it. . . . I really do not feel capable of commenting on the contents of the article. . . .

In 1965 he told Mr. Macchi, whom he met in 1964, he "was trying to develop a machine that would make a special preprinted corrugated product. They had become personal friends and he had told Mr. Macchi this, "as a matter of conversation on a subject we had in common, I told him of my desire to enter into this project." (TR 1113–14).

Another method is the raised printing of the flexographic press. While economical, the product generally has been inferior to that produced by lithographic and rotogravure printing. In the aforesaid article written by Mr. Macchi he advised improvements to this method as offering the best hope for resolution of the industry's preprinting problem. In this connection, referring to preprinting, he stated that "Two approaches are possible and are currently being used." These were, one, preprinting directly on one of the webs, and, two, preprinting on a separate sheet which would be then laminated on the completed double face paperboard; and he discussed the advantages and disadvantages of each. While writing one year after plaintiff's patent application had been filed, he obviously had no knowledge or conception of a departure from the conventional method of web printing to the extent of preprinting on sheets which would be fed onto single face to form double face.[4]

## THE PATENT IN SUIT

The patented apparatus includes the combination of what plaintiff concedes is a known sheet feeder feeding into what plaintiff also concedes is a known double facer machine and a variable speed transmission having its output driving the sheet feeder and stop to register the sheets. The output of the variable speed transmission is continuously rotating and continuously driving the sheet feeder and stop. The single face corrugated web paper board is supplied by a conventional single facer section of the prior art paper board machine, or may be brought in from outside sources. The single face web travels to the double facer with its flutes up, unlike the conventional flutes down method, and over a roller which applies glue to the corrugated surface from a glue pot. The tacky surface of the web is then presented to a sequence or discrete sheets of paper which sequentially adhere to it and are pressed against it by a pair of pressure rollers. The sheets are fed to the web by a conventional sheet feeder which picks them up one by one and sends them between the rollers onto the web. A stop between the sheet feeder and the rollers holds up each sheet during the period the previous one is rolled onto the web and then the stop moves out of the way permitting the next sheet to contact the tacky web. The double facer and feeder are driven by a single motor. The sheet feeder and stop are powered by a variable speed transmission coming off the motor. The gear ratios are adjusted each time so that when any given length sheet is to be fed, the sheet feeder will pick up sheets and feed them so that there is a two

4. Mr. Macchi in the mentioned article stated most prophetically:

With the rapid growth of the discount house and the change in merchandising patterns this has brought about, the corrugated box shipper is becoming increasingly important from a merchandising as well as a protection standpoint.

Like it or not, the corrugated box industry is being, and will continue to be called upon, to produce a better appearing final product.

"E" flute and improved printerslotters notwithstanding, it would seem the only real answer to this demand will be the wider use of pre-printed liner boxes.

GET DOWN TO BUSINESS

As it has done before on many occasions, the corrugated box industry will first fight this demand for change.

Then, later, it will get down to business and come up with whatever is necessary to adapt its product and manufacturing processes to the new marketing demands. Before long, pre-printed corrugated boxes will be common shelf items on most consumer products and there is no reason to stop there.

It is certainly conceivable that such staples as can cases can be preprinted on a universal scale on regular kraft liners at equal or less cost than at present, and with much better overall appearance as a result. Already this approach to pre-printing is taking place at several large corrugating plants throughout the country and the wheels are just beginning to turn toward the pre-printed attractive corrugated box of the future.

inch overlap, the stop will hold them until there is about a one half inch overlap, and then the stop will drop so that the overlapped sheets feed into the rollers at a speed matching that of the tacky single face web going through the rollers. In short, the speed of the sheets matches the speed of the corrugated web. If it is desired to feed in different size sheets, the variable speed transmission must be shifted to another gear or alternatively another gear must be placed in the train to the sheet feeder and stop so as to again match the sheet speed to the web speed.

The patent in suit describes the variable speed transmission as having 16 speed changes (or gears) so as to accommodate 16 different lengths of sheet which differ from one another by approximately 3″ for each setting change of the variable speed transmission. The patent in suit states that provision may be made for manually changing gears as a substitute for the variable speed transmission. Also, manually changed gears may be used in addition to the variable speed transmission to provide for additional changes of the speed of operation of the feeder. When different size sheets are processed in the patented apparatus, the variable speed transmission and manually changed gears, if desired, are shifted or changed so that the sheet feeder drive and stop are driven either faster or slower depending upon whether the sheets are smaller or larger than those for which the machine was originally set.

Plaintiff alleges infringement of Claim 2 of its patent. Claim 2 provides as follows:

Intro. Apparatus for making double-face corrugated paper having one face formed of discrete sheets of printed paper, said apparatus comprising,

1. means forming a supply of a single-face web having a corrugated surface,

2. means for applying adhesive to said corrugated surface,

3. a set of rolls for adhesively joining said printed sheets sequentially to the corrugated surface of said single-face web,

4. means for feeding said web into said rolls with said corrugated surface facing upwardly,

5. means for feeding printed sheets sequentially into said rolls with said sheets overlying said corrugated surface,

6. drive means for rotating said rolls, and

7. means including a variable speed transmission connecting said drive means to said sheet feeding means. [Numbers are supplied]

Plaintiff argues that the aforesaid Claim represents three substantial departures over the prior art:

(a) The concept of preprinting on, and feeding discrete sheets into joinder with single face, the latter having its flutes facing upwardly,

(b) marrying a sheet feeder to a double facer to make double face board, and

(c) connecting the sheet feeder to the double facer via a variable speed transmission to accommodate differing lengths of sheets.

The resultant machine, plaintiff contends, is a radical departure from or advance in the art of making high quality pictorial corrugated board: For the first time the producer of pictorial corrugated board can, by virtue of its patented apparatus, have the fine quality of lithographic printing without the wastage arising out of printing on a web.

Defendants deny any inventive breakthrough. Specifically, they contend that all the component elements of the patented apparatus were old and well known in the art and that in combination they perform no differently and accomplish no new or unexpected result.

It is undisputed that the components of the patented apparatus were all well known and extensively used in the prior art at the time of the alleged invention. Clearly, there is nothing new about cor-

rugating equipment, including the conventional single and double facers which plaintiff used from its own inventory; nor the conventional sheet feeder it also had on its premises; nor the variable drive transmission it adapted. Plaintiff contends, however, first, that the Klein patent represented a new and unobvious concept of economically manufacturing high quality pictorial corrugated double face board, using preprinted sheets instead of the traditional web; and, second, that it represented an unobvious combination of structural implementation of said unobvious concept.

## VALIDITY OF THE PATENT

Plaintiff relies heavily upon the presumption of validity. *See* Trio Process Corp. v. L. Goldstein's Sons, Inc., 461 F. 2d 66, 70 (3d Cir.), cert. denied, 409 U. S. 997, 93 S.Ct. 319, 34 L.Ed.2d 262 (1972):

> Congress provided in 35 U.S.C. § 282 (1970), that: "A patent shall be presumed valid. * * * The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting it." And this Court has recognized that " * * * the burden of proving invalidity in the face of the presumption is a heavy one." Schmidinger v. Welsh, 383 F.2d 455, 462 n. 10 (3d Cir. 1967); cert. denied, 390 U.S. 946, 88 S.Ct. 1031, 19 L.Ed.2d 1134 (1968). Indeed, invalidity must be demonstrated by clear and convincing proof, Ever-Wear Inc., v. Weiboldt Stores, Inc., 427 F.2d 373 (7th Cir. 1970); General Foods Corp. v. Perk Foods Co., 419 F.2d 944 (7th

Cir. 1969), cert. denied, 397 U.S. 1038, 90 S.Ct. 1537, 25 L.Ed.2d 649 (1970); Moon v. Cabot Shops, Inc., 270 F.2d 539 (9th Cir. 1959), cert. denied, 361 U.S. 965, 80 S.Ct. 596, 4 L.Ed.2d 546 (1960).

However, in gauging whether the presumption has been overcome, the reminder of the Supreme Court in Graham v. John Deere Co., 383 U.S. 1 at 18–19, 86 S.Ct. 684 at 694, 15 L.Ed.2d 545 (1966) should be recalled:

> We have observed a notorious difference between the standards applied by the Patent Office and by the courts. While many reasons can be adduced to explain the discrepancy one may well be the free rein often exercised by Examiners in their use of the concept of "invention". In this connection we note that the Patent Office is confronted with a most difficult task. Almost 100,000 applications for patents are filed each year. Of these, about 50,000 are granted and the backlog now runs well over 200,000. 1965 Annual Report of the Commissioner of Patents 13–14. This is itself a compelling reason for the Commissioner to strictly adhere to the 1952 Act as interpreted here. This would, we believe, not only expedite disposition but bring about a closer concurrence between administrative and judicial precedent. [footnote omitted][5]

■ Moreover, the presumption of validity does not exist if there is shown to have been appropriate prior art references which were not considered by the Patent Office. Hadco Products Inc. v.

5. In Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867, 871 n. 4 (2d Cir. 1971), it was stated: The presumption of validity accorded a patent regularly issued, referred to in the quoted passage and long recognized in judicial precedent, see, e. g., Radio Corp. of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7–8, 55 S.Ct. 928, 79 L.Ed. 634 (1934), was codified in 1952, 35 U.S.C. § 282. The Reviser's Note states: "The first paragraph declares the existing presumption of validity of patents." We have recently noted that the presumption "has no independent evidentiary value; rather, it serves to place the burden of proof on the person who asserts invalidity. Reasonable doubt on the issue of validity must be resolved in favor of the patent holder, but in the usual case a preponderance of the evidence determines the issue." Rains v. Niaqua, Inc., 406 F.2d 275, 278 (2 Cir.), cert. denied, 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed.2d 222 (1969).

Walter Kidde & Co., 462 F.2d 1265 (3d Cir.), cert. denied, 409 U.S. 1023, 93 S. Ct. 1028, 34 L.Ed.2d 315 (1972); T. P. Laboratories, Inc. v. Huge, 371 F.2d 231, 234 (7th Cir. 1966); *cf.* Hunt v. Armour & Co., 185 F.2d 722 (7th Cir. 1951).[6]

In the present case, defendants not only rely upon references not cited by or before the Patent Office but also contend that the Patent Examiner did not actually consider an important reference (Weber, 2,008,974, DX 2, tab 7) cited during prosecution, but which, defendants argue, was never applied by the Examiner or distinguished by the applicant, in consideration of the claims. The Weber patent, defendants contend, was cited by the Examiner only after the case had been allowed. They urge this Court to adopt the precedent established by the late Judge Shaw of this District in Worthington v. Southern New Jersey Newspapers Inc., 323 F. Supp. 443 (D.N.J.1970), where he held a patent invalid, and, referring to a cited, but nonapplied, reference, stated as follows (323 F.Supp. at 462–63):

These facts indicate that although the Smith 044 patent is a file reference in the 460 patent, it was not duly considered by the patent office, but merely added as a reference after final allowance of the claims in the patent; prosecution on the merits was not reopened to consider the Smith 044 patent. Furthermore, the finding here that the 460 would be obvious uses the Smith 044 in conjunction with three other prior art patents, none of which were considered by the examiner. This Court may, therefore, review the patent issued by the patent examiner and arrive at the conclusion that it should not have been allowed; "respect for * * * considered administrative decision does not justify ab-

dication of the normal judicial function."

Against this background of fundamental legal principles, the question of validity is to be resolved.

*Obviousness*

Defendants argue that Claim 2 is invalid for obviousness. Section 103 of Title 35 provides in pertinent part:

A patent may not be obtained . . . if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. . . .

In *Trio Process, supra,* 461 F.2d at 70–71, Judge Adams discussed the Graham v. John Deere prescription for determining obviousness, and its application, as follows:

Although Section 103 was enacted in 1952, it was not until 1966 that the Supreme Court definitely construed it in a trilogy of cases. Graham v. John Deere Co., 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); Calmar, Inc. (Colgate-Palmolive Co.) v. Cook Chemical Co., *id.*; United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). In *Graham,* the Supreme Court set forth the primary tests and secondary criteria for determining obviousness:

"[T]he scope and content of the prior art * * *; differences between the prior art and the claims at issue * * *; and the level of ordinary skill in the pertinent art * * *. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circum-

---

6. In *Hadco,* 462 F.2d at 1272 n. 33, Judge Forman wrote:
 Where it is shown that pertinent items of the prior art have not been considered by the Patent Office, the presumption of validity attaching to the patent is weakened. Chemical Construction Corp. v. Jones & Laughlin Steel Corp., 311 F.2d 367, 371 n. 1 (3 Cir. 1962); Dole Refrigerating Company v. Amerio Contact Plate Freezers, Inc., 265 F.2d 627, 629 (3 Cir. 1959).

stances surrounding the origin of the subject matter sought to be patented." 383 U.S. at 17, 86 S.Ct. at 694 [15 L.Ed.2d 545]. [footnote omitted]

■ It is thus incumbent upon the trial court to consider the three primary tests of obviousness and make the requisite findings. *Trio Process, supra,* 461 F.2d at 71. The "secondary considerations" may or may not require evaluation.

It is highly significant that at issue here is a combination patent. In Hadco Products, Inc. v. Walter Kidde & Co., *supra,* dealing with a design combination patent, Judge Forman wrote (462 F.2d at 1269):

. . . Under § 103 it must be determined that the differences between the prior art and the subject matter of the patent are nonobvious to a worker of ordinary skill to justify the issuance of a patent. The courts are bound to a "strict observance" of this rigorous standard.

Where, as in the present case, a combination patent is involved, additional aspects of nonobviousness come into play. The court must "scrutinize combination patent claims with a care proportioned to the difficulty and im-

probability of finding invention in an assembly of old elements." Such a patent must create a synergistic effect, one in which the combination of elements results "in an effect greater than the sum of the several effects taken separately." [footnotes omitted][7]

As to the "rigorous standard" referred to, the court stated (462 F.2d at 1269 n. 17):

. . . This standard, of course, neither diminishes the presumption of validity which attaches to a patent . . . nor lessens the burden of the party challenging a patent to prove its invalidity. . . .

*Prior Art*

■ The pertinent prior art herein is not so severely limited as to include only the making of pictorial double face board but rather includes the art of machine design, and the machines and techniques practiced in the graphic and corrugating arts. Prior art in the 35 U.S.C. § 103 sense is not limited to a separate commercial field or product such as suggested by plaintiff but rather encompasses all the pertinent art of record having to do with machinery related to the patent in suit and a knowledge from other arts reasonably pertinent to the particular problem.[8] Detailing of the

---

7. Judge Forman referred to the "statutory scheme of equating the requirement of nonobviousness of a design patent with that of a mechanical patent . . . ." 462 F.2d at 1271.
As to the "combination" rule, it is noted that in the same term as *Graham,* the Supreme Court found a combination patent for a battery was nonobvious because it produced "unexpected" results. United States v. Adams, 383 U.S. 39, 51, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966). *See also* Henkels & McCoy, Inc. v. Elkin, 455 F.2d 936 (3d Cir. 1972) ; Devex Corp. v. General Motors Corp., 467 F.2d 257, 258 n. 2 (3d Cir. 1972), cert. denied, 411 U.S. 973, 93 S.Ct. 2145, 36 L.Ed.2d 696 (1973) : "It is familiar learning that in the combining of old and familiar elements the achievement of an unexpected result is needed and may suffice to make the combination patentable. . . .";

Regimbal v. Scymansky, 444 F.2d 333 (9th Cir. 1971).

8. *Cf.* Trio Process Corporation v. L. Goldstein's Sons, Inc., *supra,* where Judge Adams wrote (461 F.2d at 69 n. 3) :
Prior art has been defined as follows :
"The existing state of knowledge in a particular art at the time an invention is made. It includes the issued patents * * * publications, and all other knowledge deemed to be common thereto such as trade skills, trade practices, and the like." A. Smith, Patent Law Cases, Comments and Materials 2 (1964).
*See also* Graham v. John Deere Co., *supra,* 383 U.S. at 35, 86 S.Ct. 684; *and see* Metaframe Corp. v. Biozonics Corp., 352 F.Supp. 1006, 1014 (D.Mass. 1972) ; Monolith Portland Midwest Co. v. Kaiser Aluminum & Chemical Corp.,

prior art to be considered by this Court must begin with a review of the proceedings attendant upon the application for the patent.

The application for the Klein patent was initially disallowed by the Examiner, as to all Claims, on two bases: Under 35 U.S.C. § 112 because they were incomplete because they omitted recitation of adhesive applying means; and under 35 U.S.C. § 103 as "unpatentable over Gans (2,318,215) in view of Harrold et al. (2,245,396) . . . . Gans discloses apparatus for feeding discrete sheets onto a continuous web. It would be within the skill of the art to use the variable speed feeder of Harrold et al. to control the feed of the sheets in Gans. No invention is seen in forming single face web in the conventional manner as disclosed in Swift." Other references cited but not so specifically applied were Greene (2,980,159) and Gebbie (2,987,105).[9]

As the File Wrapper (DX–1) discloses, the inventor and counsel thereafter conferred with the Examiner and "easily distinguished" the cited prior art in that "there was no disclosure in the prior art of means for feeding discrete sheets onto the upwardly facing corrugated surface of a single face web." The Examiner was further advised (DX–1, at 30):

. . . The art relating to corrugating was simply conventional art in which the final liner was fed to a downwardly facing corrugated surface of a single face web. The Gans patent disclosed the feeding of discrete sheets, but the sheets of Gans are linoleum blocks which are attached to a web of backing material. The Gans patent certainly did not teach one of ordinary skill in the art how to make printed corrugated board.

While the Harrold patent discloses a feeder having a variable speed mechanism, there is no structure in the Harrold patent which would provide for the change of the rate of delivery of sheets which is important to the applicants' invention in order to accommodate it to sheets of different sizes.

It was agreed that the apparatus created by the applicants represents a marked and unobvious departure from known practices in the making of corrugated board and through it, the applicants have been able to provide printed corrugated board with a minimum of waste. It was agreed to revise the claims to be sure that each is amended as to form as required by the Examiner and is amended to state that the single face web had its corrugated surface in an upwardly facing attitude as distinguished from conventional practices. . . .

Thereafter the Examiner included the Weber patent, without application or description, as an additional reference in a communication notifying the inventor's counsel that the application was "in condition for allowance."[10]

In this proceeding defendants present additional prior art which will be hereinafter examined, and which, they contend, weaken or destroy the presumption of validity of the patent in suit. The prior art offered by the defendants, in addition to that before the Patent Office, is as follows:

Thompson, U.S. 252,547, "Machinery for Manufacturing Packing and Lining Fabrics"; Parry, U.S. 1,242,720, "Lining Machines"; Hawkins, U.S. 1,327,-

267 F.Supp. 726 (S.D.Cal.1967), modified on other grounds and aff'd, 407 F.2d 288 (9th Cir. 1969).

9. Greene and Gebbie have no application and defendants included them in the prior art urged before me only because they had been cited in the Patent Office. Moreover, as shall hereinafter be stated,

Gans, Harrold and Swift are of less direct bearing than other patents which are now urged and which will be considered.

10. *See* p. 67 *supra,* where defendants' contention regarding the failure of the Examiner to actually apply Weber is set forth.

158, "Machine For Making Corrugated Paper Board"; Hawkins, U.S. 1,357,453, "Machine For Making Corrugated Paper Board"; Feybusch, U.S. 1,779,425, "Method and Apparatus for Handling Small Articles"; Huye, U.S. 1,792,986, "Double Face Covering Machine"; Cohen, U.S. 3,058,869, "Pre-Printed Corrugated Board Fabrication and Cut-Off Control Method and Apparatus"; Cenpa, British 594,328, "Process and Plant for Manufacturing Longitudinally Corrugated Cardboard and Cross-Corrugated Cardboard and Products Obtained Thereby"; Julien, British 675,911, "Sheet Separator in the Feeding of Sheets, Particularly Corrugated Sheets, to Machines"; Ken's Mechanical Engineers' Handbook Twelfth Edition; Marks Mechanical Engineers' Handbook Sixth Edition; Graham Variable Speed Transmission—1949; Encyclopaedia Britannica, Fourteenth Edition, Vol. 18, 1939, pp. 393–395 inclusive.

█ It is true that each of the components of the patented apparatus were all well known, as defendants urge. *See* pp. 65–66, *supra*. Obviousness can be shown by combining elements of several prior art structures; it is unnecessary to find all the elements in one prior reference. Sperti Products, Inc. v. Coca Cola Co., 399 F.2d 607 (3d Cir. 1968); Gould-National Batteries, Inc. v. Gulton Industries, Inc., 361 F.2d 912 (3d Cir. 1966).

Plaintiff, however, resorts to the contention that it has invented a combination apparatus of which, as in *Trio Process, supra,* it can be said [461 F.2d at 72 Fn. 18a]:

. . . invention might lie in the realization of the exact problem to be solved. When the identification of the problem is not obvious, the invention can be patentable, even though the solution to the problem would then be obvious.

The "problem to be solved," plaintiff argues, was how to use high quality lithography without being compelled to discard large quantities of corrugated web.[11] Its solution to this problem was to preprint sheets by lithography and then, by sheet feeder, to drop them on single face. It contends that its "invention as a whole must be considered" and that where the invention as a whole embraces the discovery of a problem or the discovery of a conceptual solution to the problem, the claims should be held valid even though they consist of elements which are individually old in the art and even if the combining of the elements was obvious to one who had been presented with the novel and unobvious concept.

*Trio Process,* however, is as readily distinguishable here as it was in *Hadco Products, supra*.[12] In *Trio Process* the prior art pointed not toward but away

11. *Cf.* Cohen, U.S. 3,058,869, DX 2, tab 12, relating to producing lithographed double face by web preprinting.

12. Judge Forman, in *Hadco* (462 F.2d at 1274 n. 47), stated:
In the recent case of Trio Process Corp. v. L. Goldstein's Sons, Inc., . . . clearly distinguishable from the present case, this court sustained a process patent which consisted of a combination of steps known in the art, reasoning that, "the essence of the Spitz invention did not lie in the individual steps, but rather, consisted of combining the steps in an unsuggested manner into a process that would achieve a substantially different function and result from the other processes of which the individual stages were a

part. (footnote omitted). Where such occurs, the invention of a process may be patentable despite the fact that the individual phases were known in the art."
Also cited by plaintiff but readily distinguishable is Frank W. Egan & Co. v. Modern Plastic Machinery Corp., 387 F.2d 319 (3d Cir. 1967), cert. denied, 391 U.S. 966, 88 S.Ct. 2036, 20 L.Ed.2d 879 (1968), where the Court of Appeals stated at 387 F.2d 323: ". . . Willert . . . uses the hydraulic 'back pressure' in a manner neither indicated by the prior art nor obvious to a person skilled in the art . . . ." Application of Sponnoble, 405 F.2d 578 (CCPA 1969), is also inapposite, as it deals with ascertainment of the real cause of a pharmaceutical problem. Eibel Process

from the invention in suit, and indicated that high temperature burning was more advantageous than the patented low temperature burning. Indeed, in *Trio Process* it appeared that, even after having been apprised of the patented concept, defendants still could not reduce it to practice without first obtaining instructions from the patent owner. See 461 F.2d at 72. In the case at bar the prior art did not point away from the invention, but rather shows the use of a sheet feeder in corrugating machines, suggesting of course application of sheets rather than web for at least one liner of multi-ply paperboard.[13] Moreover, the elements making up the combination in suit, because they were so well known, and because each performs in plaintiff's apparatus as it does in proved prior art, are readily installable by one of ordinary skill in the pertinent art, once given the assignment "to feed preprinted sheets onto single face." *See* Reckseit TR 771–73, 775–76, 986–88, 1071; Summers TR 272–74.

This Court thus finds that "the problem to be solved" was readily identifiable, it was how to avoid the "repeat" factor in using a fixed circumference web-fed lithographic press. The solution, I find, was just as readily identifiable in the pertinent prior art, to use a sheet feeder, feeding preprinted sheets.[14]

▮ Adhering of sheets onto single face was taught in defendants' prior art references, Weber, Cenpa and Julien (DX 2, tabs 7, 13 and 14). Also, Weber, while making double wall board, fed discrete sheets onto single face having the flutes thereof facing upwardly. The only difference between these prior art references and the patent in suit is that the former fed sheets of double face whereas the patent in suit feeds printed

---

Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 68, 43 S.Ct. 322, 67 L.Ed. 2d 523 (1923) is likewise not in point. Here again a patentee did not remedy a known source of trouble, but discovered a "source not before known . . . ."

13. Not only does the prior art teach the use of sheet feeders in conjunction with corrugators, but the usage of sheet feeders is almost a standard item in the printing and corrugating industries. A folder gluer uses a sheet feeder (Summers TR 169–70); top sheet feeders are used for printing presses (Summers TR 173); printer slotters employ a sheet feeder (Summers TR 183); die cutters use sheet feeders (Summers TR 191) and they employ gear drives between the sheet feeder and the main drive unit (Summers TR 193). Plaintiff itself has numerous types of sheet feeders. (Klein TR 1586). *See also,* Reckseit TR 766; Benninghoff TR 542–45.

The obviousness of employing a sheet feeder is further demonstrated by the following prior art references:

1. U.S. Patent 1,242,720 issued to Parry (DX–2, tab 3) discloses a semi-automatic machine which feeds sheets in abutting relation onto a moving web. Further, this reference employs a stop-like member to hold and release the sheet in registration (Fishleigh TR 1269–72).

2. U.S. Patent 1,779,425 issued to Feybusch (DX–2, tab 5) demonstrates a machine wherein lithographically printed labels are lifted by means of a vacuum lifter and positioned on a web of material. The labels are positioned with respect to one another in varying arrangements, some being widely spaced while others are abutting (Fishleigh TR 1272–74).

3. U.S. Patent 1,792,986 issued to Huye discloses a machine wherein individual sheets of cardboard are positioned between two moving webs of paper. Provision is made in this machine to accommodate different size sheets by means of changing gears, the same means stated in the patent in suit as being a "substitute" for the variable speed transmission (Fishleigh TR 1275–79).

14. Plaintiff went to sheet printing in order to get the greater length required by a customer's large order. Plaintiff preprinted these sheets and then joined the sheets end to end adhesively into web form. The time and cost were so great that Klein et al. went to a sheet feeder. Then of course they discovered the flutes were "going the wrong way" and therefore turned the single facer around so that the flutes would move toward the double facer facing upwardly. After this plaintiff "secured business because we were now able to overcome the problem of the waste, the problem of the repeat. . . ." (TR 1546).

sheets; and this difference is further diminished when it is realized that the patented apparatus does not need printed sheets to be operative. Such a difference does not amount to a patentable invention.

Weber also shows that one may feed the single face into the double facer with either the flutes facing upwardly or downwardly as desired, as does Hawkins, '158, which forms double face board by feeding the single face into the double facer with the flutes facing upwardly.[15]

Plaintiff's concept, then, of preprinting sheets rather than web, has no identical antecedent in the prior art. However, the differences between the pertinent prior art and the claim in suit would, I find, have been obvious to a person reasonably skilled in that art.[16] The hypothetical man would have had available to him the many uses to which sheet feeders are put in the printing and corrugating industries; the idea, well known, of preprinting by lithography on web; and the obvious nature of the repeat problem. He would also have available the prior art which presented sheets being fed onto web in making corrugated boxes, as in Weber, Cenpa and Julien.[17]

15. *See also*, Klein TR 1581; Benninghoff TR 616. Plaintiff concedes the teaching of this prior art but refers to "ancient patents."

16. *Graham* mandates determination of the ordinary skill in the pertinent art. One of ordinary skill in the art is frequently defined as a hypothetical man somewhat akin to the reasonable man in a negligence case. Moreover, he is charged with knowledge of all pertinent art. As stated by the Second Circuit in David & David, Inc. v. Myerson, 388 F.2d 292 (2d Cir. 1968) at 294:

> . . . the general test is an objective one, as the patent holder must be deemed to possess all the available knowledge in the applicable art.

And, as stated in Norris Industries, Inc. v. Best Universal Lock Co., 296 F.Supp. 372 at 379 (S.D.Ind.1968):

> An inventor is charged with knowledge of all that the prior art, taken as a whole, discloses with respect to the subject matter of the invention, and a person skilled in the art is further presumed to have had at his disposal all relevant prior art constructions and patents.

The level of ordinary skill in the art to be considered in determining obviousness or unobviousness is that present in the art of machine design generally including graphic arts machines and various printing methods and corrugated paper machines, which includes, but is not limited to, a knowledge of various available components and mechanisms, power sources, drive elements and a familiarity with their individual characteristics and capabilities, and a knowledge that such elements are routinely assembled in various combinations and subcombinations depending upon the desired result. By way

of example, plaintiff's witnesses, Messrs. Benninghoff and Summers were not "men of ordinary skill in the art" in the 35 U.S.C. § 103 sense. Summers had no technical background nor did he conduct any patent search and Benninghoff similarly had no knowledge of the machines taught in the art cited by defendants, which this Court has found to be not only pertinent but a substantial anticipation of the patent in suit.

17. The Cenpa patented device makes double wall corrugated board and includes a single facer and double facer. A stack of single face corrugated sheets is fed onto a web of single face, resulting in double wall material, with one layer transverse and one layer longitudinal of the direction of travel of the machine in the same manner as the Weber structure. There is a bottom feeder and the single face web has its corrugations facing down. The drive to the sheet feeder comes from the drive for the combining section.

The Julien patented device is a structure for making double wall corrugated material with the corrugations of the lower and upper wall at right angles to one another. The stack that goes into the feeder is of single face material similar to Weber or Cenpa, and is fed by a bottom feeder from the stack. It has a variable speed transmission. The Julien patent says:

> The present invention relates to a sheet separator, i. e., a mechanism which permits of the feeding one by one at predetermined intervals into a continuously operating machine of any desired kind of flat elements, such as sheets of paper, cardboard, corrugated board . . . removed one by one from a pile of such elements. DX 2, tab 14.

One reasonably skilled in the corrugating art would know, by virtue of said prior art, that sheet feeders can be and are put into a corrugating line, and that the web concept is to that extent replaced by feeding sheets of paper board.

That these patents do not reveal feeding of *printed* sheets I regard as an inconsequential difference, just as I regard the fact that they feed sheets of double face rather than single-ply sheets. To the reasonably skilled person in the art, therefore, with a knowledge of Weber, Julien, and Cenpa, sheet feeding of one liner of a double face container would not be an unobvious concept.

Nor does plaintiff fare better when it claims unobviousness in the structural implementation of the Klein concept. Given the requirement for satisfying § 103 as applied to a mechanical combination patent *(see* pp. 68–69, *supra),* each and every component (which individually, as has been stated, is old and well known) functions in the combination in the same way and with the same result as it does individually and in prior art apparatus. There is no "synergistic effect" nor does the combination result "in an effect greater than the sum of the several effects taken separately." *See* Hadco Products, Inc. v. Walter Kidde & Co., *supra,* 462 F.2d at 1269.

Plaintiff rests heavily upon the variable speed transmission element of its patented apparatus in urging an unobvious combination. *See* pp. 64–65, *supra.* Plaintiff freely concedes that this component is old and well known.[18] Yet it argues that its adaptation, in the patented combination, is unmatched in, and not suggested by, the prior art.[19] The record is otherwise. Thompson, Parry, Feybusch, Huye, Harrold (cited by the Examiner), Julien and Cenpa all disclose variable speed transmissions of one kind or another. *See also,* Graham Variable Speed Transmission—1949, DX 2, tab 17. I also accept the analysis of defendants' expert Fishleigh who, taking Weber, stated that addition thereto of a variable speed transmission as between one set of driving means and another would be nothing more than a mechanical expedient of what was virtually a shelf item (TR 1294).

Plaintiff acknowledges the presence of variable speed transmissions in the aforesaid prior art but states as follows (Pff's Proposed Findings of Fact 60 and 61):

60. Further, defendants' engineer witness, Mr. Fishleigh, testified that neither Weber nor Julien disclose connection of a variable speed transmission between the sheet feeder and the

---

18. Mr. Konold stated at trial (TR 1265): "I question the value or relevancy of all this detailed explanation of how some variable speed transmissions operate. I think the plaintiff is willing to concede that there are a great many different types of variable speed transmissions and they have been in common use for a great many years."

19. I do not find the testimony offered by plaintiff from Messrs. Macchi, Plunkett, Benninghoff, and Summers persuasive on the issue of obviousness, in the face of the prior art. Pertinent is what the Supreme Court stated in Graham v. John Deere Co., *supra,* 383 U.S. at 36, 86 S.Ct. at 703:

. . . no one apparently chose to avail himself of knowledge stored in the Patent Office and readily available by the simple expedient of conducting a patent search—a prudent and nowadays common preliminary to well organized research. . . .

I discount specifically the testimony of Summers and Benninghoff relating to their "disbelief" and their being "literally amazed" that the apparatus of the patent in suit "was feeding sheets to a corrugator". *See* Pff's Proposed Findings of Fact 41. Feeding of sheets "to a corrugator" was well covered by prior art and, had they been familiar with it as it has been presented in these proceedings, they would not have been so ill prepared to accept the Klein concept. The same is true as to plaintiff's expert, Mr. Reckseit. Significantly, Benninghoff was totally unfamiliar with the "flutes up" concept (TR 490). Yet, as has been stated, both Weber, and before it, Hawkins, present single face in that manner.

combining rolls for varying the frequency of sheet feeding dependent on sheet length (Fishleigh TR. 1299, 1306, 1499–1501).

61. Variable speed transmissions of one form or another are found in certain of the prior art machines, e. g., Harrold, Cenpa, Julien, Cohen, Thompson, etc. However, in no case is the variable speed transmission capable, without either relocating the variable speed drive in the machine and/or structurally modifying the machine, of altering the frequency of feeding variable length sheets with respect to a constant speed web of material as is done in the Klein et al. machine and as is necessary to accommodate in a single machine the feeding of different length sheets (Fishleigh TR. 1306, 1499, 1501; Reckseit TR. 1795–1796).

I expressly find that the differences between the prior art use of variable speed transmissions and that of the Klein patent are not such as would not be obvious to one reasonably skilled in the art as I have previously defined it.

Again, therefore, I do not find plaintiff to have crossed that threshold of proof requirement for unobviousness as to a patent utilizing old and well known components in a claimed new combination.

Turning now to the legal presumption of validity, see pp. 65–68, supra, of the prior art I have considered significant in these proceedings, only Weber was cited by the Patent Office but under peculiar circumstances. See p. 67, supra. The File Wrapper discloses it was never applied.[20] The significance of this is heightened when it is observed that it was not cited until the Examiner's announcement of allowance and that, whereas other prior art,

clearly more remote, was in detail earlier applied to reject the application (Gans, Harrold and Swift), Weber's citation came only after it is clear that the Examiner had called for the applicant to amend the claims to express the upward· facing flutes, *a mode of Weber*. Given what was obviously a significant stage [defendants' expert, Fishleigh, stated: ". . . this particular element . . . was put in at the very end to avoid the then existing prior art" (TR 1297)], how could the "flutes up" feature of Hawkins have been overlooked, and on what basis could the Examiner's citing Weber, but without application thereof, be reconciled with the obvious importance given to the "flutes up" element?[21]

The other patents left uncited which have pertinence, such as Cohen, Julien, Cenpa, Huye, and others urged by defendants in this proceeding, lead me to conclude that the presumption of validity is considerably weakened, if not indeed destroyed. Worthington v. Southern New Jersey Newspapers Inc., and other authorities cited at p. 67, *supra*.

Under the circumstances, in view of my finding of obviousness, I need not review the "secondary considerations" as set forth in *Graham, supra*, 383 U.S. at 17–18, 86 S.Ct. 684. Anderson's-Black Rock, Inc. v. Pavement Salvage Co., Inc., 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969); Hadco Products, Inc. v. Walter Kidde & Company, *supra*, 462 F. 2d at 1275.

■ Nonetheless, in view of plaintiff's having urged great commercial success for its invention, I shall deal with its contention in this regard. Plaintiff claims to have now three machines, up from its original one. The record hardly supports a finding of commercial success. Moreover, defendants'

20. *See Graham, supra*, 383 U.S. at 33, 86 S.Ct. at 702: "It is, of course, well settled that an invention is construed not only in the light of the claims, but also with reference to the file wrapper or prosecution history in the Patent Office. . . ."

21. I accept, however, Fishleigh's testimony that: ". . . Whether or not you have the corrugations down or turn them up is immaterial. That is just a reversal of parts, as we have in many instances in a patent situation . . . ." TR 1304.

argument on this point has substantial merit. Defendants state (Defs' Post Trial Brief, 27–28):

> To support an allegation of commercial success, it must be demonstrated that whatever has achieved the status of commercial success conforms to the claimed invention. Moreover, an apparatus which has achieved commercial success but does not comply with the claim in issue, has no bearing whatsoever on the validity of the claim in issue. Fredman v. Harris Hub Company, 442 F.2d 210, 214 (7th Cir. 1971).

> The machines which plaintiff claims constitute commercial success fail to comply with the language of the claim in suit in several respects. First, the claim in suit does not specify a stop whereas each of plaintiff's three machines includes such a stop (Klein TR 1599). Secondly, the production machines differ from the claim in suit in that the claim in suit calls for a variable speed transmission whereas the production machines incorporate a PIV type variable speed transmission, which is not disclosed or claimed in the patent in suit (Reckseit TR 669; Benninghoff TR 499–500). Moreover, each of plaintiff's machines has a clutch-brake electric eye cut-off mechanism, another item not disclosed or claimed by the patent in suit (Benninghoff TR 606) and also intermittently moving pressure rolls, again not disclosed or claimed in the patent in suit (Benninghoff TR 502).

Defendants' position is well taken and I find there has been no sufficient showing of commercial success.

By virtue of the foregoing, I find the Klein patent invalid for obviousness.

### The Patent In Suit Fails To Adequately Disclose an Operative Machine

Title 35, U.S.C. § 112 requires that the disclosure of an invention be in such full, clear, concise and exact terms as to enable any person skilled in the art to which it pertains to make and use the invention. Decisional law amplifies the statutory requirement to require sufficient information to be given in the patent so that one skilled in the art does not have to indulge in experimentation to ascertain how to practice the invention. Additionally, the statute requires that the specification ". . . shall set forth the best mode contemplated by the inventor of carrying out his invention". A patent is invalid if it fails either requirement. *See* Flick-Reedy Corp. v. Hydro-Line Mfg. Co., 351 F.2d 546 (7th Cir. 1965), cert. denied, 383 U.S. 958, 86 S.Ct. 1222, 16 L.Ed.2d 301 (1966); *and see* Standard Brands v. National Grain Yeast Corp., 101 F.2d 814, 822 (3d Cir.), aff'd, 308 U.S. 34, 60 S.Ct. 27, 84 L.Ed. 17 (1939):

> It is settled that if the disclosure of a patent is so indefinite as to require independent experiments, the patent is void.

The patent in suit (PX–157) states with respect to the cut-off mechanism at column 3, line 20 as follows:

> After passing through the drier, the doubleface paperboard is cut to proper size through apparatus commonly used in corrugating and which forms no part of the present invention.

The testimony as to whether plaintiff's cutoff was conventional and as "commonly used in corrugating" was conflicting. On balance I must find that the meager description was insufficient.

*See* DX–35, Column 3, line 24, a subsequent Klein patent, stating that the cutting mechanism in a conventional corrugator is inadequate for the Klein apparatus and that it is of critical importance in its machine that all printed sheets be cut at the same location and that no cumulative error be permitted.

Also, Mr. Klein testified that plaintiff had a problem relating to the cutoff when the machine was first structured. He explained how he first approached the General Electric Company but was told they could not provide a cutoff which would satisfy his requirements. Then, by accident, Mr. Klein came

across a supplier who provided an electric eye cutoff which would satisfy his requirements. This is the cutoff which the patent states is "commonly used in corrugating".

*See also* Benninghoff, TR 502 et seq.; 510, 606. This gentleman stated he had not seen a cutoff like the Klein device. Moreover, all three of plaintiff's machines employ the rotary knife clutch-brake electric eye cutoff system disclosed in Klein's latter patent but which Mr. Reckseit, plaintiff's expert, stated was not commonly used in corrugating in 1963. *See also* Fishleigh, at TR 1250, and Mr. Bradshaw at TR 1182.

### The Claim In Suit Defines An Inoperative Structure And is Invalid

The claim in suit, Claim 2, makes no reference to the movable stop described in the patent specification and illustrated in the drawings as Item No. 75 (PX–157). Each of the remaining six claims in the patent refers to a movable stop, and plaintiff admits that defendants do not infringe any of these six claims (DX–99, Request for Admissions 1–7).

 Title 35 U.S.C. § 101 requires that any patentable invention be useful and accordingly, the subject matter within the claim must be operable. Hartford-Empire Co. v. Obear-Nester Glass Co., 71 F.2d 539 (8th Cir.), cert. denied, 293 U.S. 625, 55 S.Ct. 345, 79 L. Ed. 712 (1934). I find that Claim 2 of the patent in suit is invalid because it fails to recite a movable stop, without which the machine will not operate as it is intended to operate. McCutchen v. Singer Company, 386 F.2d 82 (5th Cir. 1967).

Each of plaintiff's three machines includes a stop. I find the stop necessary, since both the sheet feeder and stop are regulated by the variable speed transmission in response to the size sheet being processed, a fact heavily relied upon by plaintiff in its unobviousness argument.

However, the belt or conveyor apparatus interposed between the sheet feeder and stop operates at the same speed regardless of what size sheets are being processed. With this arrangement, the stop is necessary to facilitate the type of registry described by Mr. Reckseit at TR 662. This was illustrated by the demonstration provided for me at trial. The machine functioned properly when operated without the stop when the same size sheets as previously processed with the stop were used. But the machine, without the stop, was totally incapable of accommodating a different size sheet since the conveyor belt was still operating at the same speed as previously and because the stop was not present to provide registration with the sheet feeder which was now operating at a different rate.[22]

While Mr. Reckseit at trial minimized the importance of the stop, he stressed its value on another occasion, when he filed an affidavit in the Patent Office, as follows (DX–36, p. 92):

> The handling of the sheets which involves controlling them in a stack, letting go of the control while they move toward the combining section and thereafter regaining control to combine them in proper registration with the single face, would seem to involve such complexity as to be completely alien to the thinking of persons of ordinary skill in the art.

The regaining of control while they are moving toward the combining section is accomplished by the movable stop, Item No. 75 of the patent in suit (PX–157).

Accordingly, I find Claim 2 is invalid because it does not encompass an operative structure and fails to comply with 35 U.S.C. §§ 101 and 112.

### INFRINGEMENT

 Plaintiff bears the burden of proving patent infringement by a pre-

---

22. Conceivably, as argued by plaintiff, an experienced operator can make adjustments to compensate to a degree for the lack of a stop under such circumstances. This does not mean, however, that the stop is unnecessary.

ponderance of evidence. Becker v. Webcor, Inc., 289 F.2d 357, 360 (7th Cir. 1961), cert. denied, 368 U.S. 970, 82 S. Ct. 445, 7 L.Ed.2d 398 (1962); United States Rubber Co. v. General Tire & Rubber Co., 128 F.2d 104, 108 (6th Cir. 1942).

▆▆▆ To establish infringement, each element in the allegedly infringed claim must be found in the accused structure. The Court of Appeals for this Circuit has stated this principle in Q-Tips, Inc. v. Johnson & Johnson, 207 F.2d 509, 511 (3d Cir. 1953), cert. denied, 347 U.S. 935, 74 S.Ct. 630, 98 L.Ed. 1086 (1954), as follows:

In a combination patent, every element claimed is deemed essential, and the patentee will not be heard to assert its immateriality.

*See also* Zaidan v. Borg-Warner Corp., 281 F.Supp. 72, 75 (E.D.Pa.1968):

All of the elements of a combination patent are deemed to be material; evidence to the contrary is not admissible. To establish infringement of a combination claim, it must be proved that the accused device employs all of the elements set forth in the claim. Omission of a single element is fatal to a charge of infringement.

▆▆▆ Claim 2 is not infringed because elements recited therein are not present in defendants' machine, nor is there, contrary to plaintiff's claim, an equivalent structure in the accused apparatus. *Cf.* Graver Tank & Mfg. Co. v. Linde Air Products Co., 339 U.S. 605, 607–610, 70 S.Ct. 854, 94 L.Ed. 1097 (1950).

Defendant Carlin was issued United States Patent 3,639,194 on February 1, 1972 for an Apparatus For Making Double Face Corrugated Board With Fine Printing Thereon, on an application filed on February 12, 1969 as Serial No. 798,619. Among the references which were cited during prosecution were the patent in suit; U.S. Patent 2,008,974 issued to Weber; and British Patent 675,911 issued to Julien.

The Carlin apparatus employs an intermittently operating drive (not a continuously operating drive, like Klein) for feeding the sheets from a sheet feeder onto a moving web of corrugated board. This operation is accomplished by an electric eye sensing a mark on a sheet moving in the double facer, which causes a clutch to engage and a brake to release so that a motor may drive the sheet feeder, which then proceeds to move one individual sheet toward the double facer. As that sheet is moved out, the motor drive to the sheet feeder is disengaged and the sheet feeder stopped by the clutch opening and the brake being applied until such time as a mark on the sheet which has just been moved toward the double facer activates the electric eye to initiate the cycle again. If the sheet were pulled out of the machine before the mark reached the electric eye, the machine would stop. The sheet feeder in Carlin's apparatus is intermittently driven regardless of the size sheet being processed through the machine. In the patented machine, the sheet feeder is continuously driven, but when different size sheets are processed, the speed the sheet feeder is driven at is different. When a different size sheet is processed in Carlin's apparatus, no change in gears or resetting of a transmission is required, as in the patented apparatus. The Carlin machine automatically feeds different size sheets without adjustment of the drive, unlike the patented machine. Further, the Carlin machine, within certain maximum overall dimensions, will feed any length sheet, not just sheets of certain lengths matching the available gear ratios as in the patented apparatus.

In determining infringement, it is important to determine whether or not the accused structure fairly responds to the language of the Klein claim.

There is no dispute that the Carlin apparatus fairly responds to the Introduction and the first two elements of the claim in suit, which read as follows:

Apparatus for making double-face corrugated paper having one face formed

of discrete sheets of printed paper, said apparatus comprising,

(1) means forming a supply of a single-face web having a corrugated surface,

(2) means for applying adhesive to said corrugated surface . . . .

As to elements 3, 4, 5 and 6 of the Klein claim, however, the situation is distinctly different. These read as follows:

(3) A set of rolls for adhesively joining said printed sheets sequentially to the corrugated surface of said single-face web

(4) Means for feeding said web into said rolls with said corrugated surface facing upwardly

(5) Means for feeding printed sheets sequentially into said rolls with said sheets overlying said corrugated surface

(6) Drive means for rotating said rolls.

Klein's "set of rolls," described in the Klein patent as "pressure rolls" (PX–157), are nos. 40 and 42 in the illustration of the apparatus provided with the patent. They take the sheet and single face after the stop of the sheet feeder and before the two rolls 45 and dryer 21 of the patent illustration. The upper pressure roll No. 42 is above the pressure roll No. 40. As to these rolls the patent states:

. . . sheets 19 are fed between the upper pressure roll 42 and the single face web 10 passing around roll 40, the sheets being joined to the single face at that point. The thus formed double face board is passed between the two rolls 45 and into the drier 21.

I am persuaded that the said "pressure rolls" in the Klein apparatus "nip" the sheet and the single face, making line contact, and forming the double face. The accused apparatus does not use pressure rolls to form double face

but uses a compression section in which two 15-foot long belts slowly come together to accomplish two purposes, maintain alignment of the paperboard and gradually adhere the materials. The crowned rolls of the accused apparatus do not have a combining function and do not cause joining of the sheets to the single face.

Moreover, in addition to the difference in structure, the sheets are joined to the single face differently in the two apparatuses. Plaintiff's patent teaches; indeed, requires, overlap between successive sheets to preclude underlying glue from the pressure rollers. The accused apparatus operates with a gap between successive sheets. This was translated by plaintiff's expert as indicating the two machines operated differently. TR 906, 926, 1011; *and see* Fishleigh TR 1513.

As stated by the court in Leach v. Badger Northland, Inc., 385 F.2d 193, 197 (7th Cir. 1967):

To hold that the defendants' accused devices infringe, we must find identity of structure, operation and result . . . Identity of result is not sufficient.

*See also* Hughes v. Magnolia Petroleum Co., 88 F.2d 817, 818 (5th Cir. 1937):

Patents on simple combinations should be, they are difficult to obtain. If sustained, they should be, they are confined strictly to the particular combination claimed. * * * Such patents are not easily infringed for while in principle the doctrine of equivalence is applicable to them, it is only so when most narrowly circumscribed.

Finally, as the late Judge Shaw stated in Worthington v. Southern New Jersey Newspapers, Inc., 323 F.Supp. 443, 469 (D.N.J.1970), when holding that mist guards are not the equivalent of a housing

A patent which is not a "pioneer patent" but a combination of elements, all

of which are old, should be properly limited to the precise elements therein.

Thus I find that the accused apparatus does not respond to the claims in suit in that it does not have "a set of rolls for adhesively joining" as defined in the patent and, further, that it does not operate in the same or equivalent manner to the patented machine. Accordingly, there is no infringement.

*Defendants' Machine Does Not Have A Variable Speed Transmission As Specified In Claim 2*

The claim in suit relies upon and specifies a variable speed transmission as connecting the drive means to the sheet feeding means, which variable speed transmisssion is required by the patent to be of a non-slip type (PX–157, Column 5, lines 40–45). I find that the defendants do not employ a variable speed transmission, or a mechanical equivalent thereof. Defendants' clutch brake mechanism, operated by an electric eye, is a different mechanical element than the non-slip variable speed transmission as required by the claim in suit (TR 882, 903–4, 1784).

The patent in suit at column 4, lines 35–48, indicates that the only substitute for a variable speed transmission contemplated by the patentees was a set of change gears. To demonstrate further than the inventors, Klein et al., did not contemplate a clutch brake as an equivalent of the variable speed transmission, in their subsequent patent 3,591,436 a clutch brake cutoff mechanism and variable speed transmission are described as different elements and there is no indication of them being equivalent or interchangeable.

With respect to the variable speed transmission described in the patent in suit, it is a manually shiftable gear arrangement having 16 speed changes (PX–157, Column 4, lines 36–9). To change speeds to accommodate different lengths of sheet, the machine must be shut down and the gears manually shifted. Plaintiff's production machine did not follow the teaching of the patent in suit but rather employed the PIV or positively infinitely variable speed transmission (Reckseit TR 669). This PIV was incorporated into the model which therefore is not representative of what is encompassed by the patent in suit. The PIV allows the making of fine adjustments rather than the manual changing of gears described in the patent (Reckseit TR 868). Moreover, in order to adjust the model machine which included the PIV, the machine must be running so as to make proper adjustments, all of which could not be accomplished with the patented structure.

The accused machine does not possess element 7 of the claim in suit being:

(7) Means including a variable speed transmission connecting said drive means to said sheet feeding means.

Rather, defendants' machine has no variable speed transmission connecting the main drive means to the sheet feeding means and nothing which is the mechanical equivalent thereof. In the Klein patent in suit the sheet feeding means is always running whenever the main drive means is operating. In defendants' machine the sheet feeding means and its operating mechanism does not run continuously when the main drive is operating. On the contrary, it runs intermittently.

The drive for the sheet feeding means in defendants' machine comes from the conveyor drive to a continuously rotating shaft which is, in turn, connected to a clutch and brake. At the output side of the clutch and brake there is an intermittently rotating shaft. When the clutch is engaged, the shaft rotates and when it rotates, the feeder is actuated. The clutch is controlled by an electric eye which operates in response to the passage of a printed mark on one printed sheet as that sheet is carried through

the conveyor belts. That initiates the feeding of the next following printed sheet. When the clutch is engaged, the feeding means advances one sheet and then returns to its starting point at which time the clutch is disengaged and the brake is actuated. The feeding means remains quiescent until the clutch is again engaged in response to the operation of the electric eye.

Turning to plaintiff's reliance upon the doctrine of equivalents, the Supreme Court in Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950), analyzing the purpose of the doctrine, stated as follows:

> The doctrine of equivalents evolved in response to this experience. The essence of the doctrine is that one may not practice a fraud on a patent.

■■■ I find no "fraud on a patent" here, nor do I find that the difference between the accused apparatus and the patented apparatus is a minor variation introduced to avoid forthright duplication.

I find instead that the accused apparatus was independently developed along lines departing substantially from the patent in suit, as an improvement thereon.

I credit Mr. Plunkett's testimony that he did not use the Klein patent in developing his own machine. See the sketch prepared by Mr. Plunkett prior to first seeing the Klein patent (DX–98). At that time, Mr. Plunkett was feeding discrete sheets onto single face with the flutes facing upwardly. He utilized an electric eye to activate and cause the sheets to be fed. Moreover, as has been stated, he did not then, and does not now, utilize a variable speed transmission, but rather an electric eye mechanism.

■■■ It is of some significance that the Patent Office issued a patent on defendants' apparatus over prior art which included the patent in suit. See Mc-Cutchen v. Singer Co., supra, 386 F.2d at 88, where, in holding that the accused apparatus did not constitute an equivalent, the court stated:

> The doctrine of equivalents which plaintiff urges in support of his claim of infringement is inapplicable because *the two machines perform in entirely different ways and with entirely different mechanisms.* The Patent Office must have agreed when it granted Singer a patent on its machine *after* the McCutchen patent. A patentee who has made only a narrow improvement and cannot prevent others from making improvements on the prior art if they do not use substantially the same method and novelty. [Emphasis in original]

For the foregoing reasons I find that defendants' independently developed apparatus does not infringe the Klein patent, nor do the means employed constitute an equivalent thereof.

## MISCELLANEOUS CLAIMS AND DEFENSES ASSERTED BY DEFENDANTS

To provide a full record for possible appellate review, I shall deal with these additional contentions raised by defendants, notwithstanding my determination on the primary issues of validity and infringement.

### Plaintiff's Alleged Improper Conduct In Procurement Of The Patent In Suit

■■■ The Examiner in his initial examination of the application for the patent in suit, rejected all the claims including the one now in suit (DX–1, p. 25). Plaintiff, through its attorney and Mr. Klein, then conferred with the Examiner handling the application. During the interview reference was made to some prior art reference involving double wall corrugated board formed with a sheet of transverse corrugating material (DX–92; Klein TR 1615); however,

none of the references of record at that time related to double wall board. It appears that they discussed the Weber patent, but thereafter Mr. Klein did not refer to Weber in the amendment filed after the interview (DX-1, p. 30). In the amendment plaintiff, notwithstanding Weber, stated as to "feeding discrete sheets onto the upwardly facing corrugated surface of a single face web," that there was no such disclosure in the prior art. This is of some significance in that the applicant, in response to the Examiner's direction, agreed to amend all the claims to state that the "single face web had its corrugated surface in an upwardly facing attitude as distinguished from the conventional practice" (DX-1, p. 30). It would appear that the Examiner may not have been aware of the teachings of Weber.

At the aforesaid interview and, in the responding Amendment, plaintiff represented that single face web with the corrugated surface in an upwardly facing attitude was distinguished from conventional practices (DX-1, p. 31). Defendants argue that on this basis, the Examiner required that the claims, including claim 2, be amended to specify that the "single face web had its corrugated surface in an upwardly facing attitude", and that this was misrepresentative of conventional practices as demonstrated by the activities right at plaintiff's plants, which fact, states the defendants, was not told to the Examiner. TR 1630.

Defendants claim the foregoing procedure violated Patent Office Rules of Practice and the Manual of Patent Examining Procedure.

While this Court has concern over the procedures thus utilized, the record does not support invocation of Monsanto Company v. Rohm & Haas Company, 456 F.2d 592 (3d Cir.), cert. denied, 407 U. S. 934, 92 S.Ct. 2463, 32 L.Ed.2d 817 (1972), nor amount to that degree of inequitable misconduct as would warrant denial of equitable relief.

*The Patent In Suit Is Unenforceable Because Of Plaintiff's Alleged Inequitable Conduct Both Before This Court And The Patent Office*

Defendants charge that plaintiff filed for the patent presently in suit in 1963 and attempted to enlarge its original coverage by obtaining yet another patent with broader claims on what is basically the same invention, but which latter patent did not issue until 1971 (DX-35). Defendants assert further than plaintiff attempted to enlarge its patent coverage and used the process of this Court to obtain inspections of defendants' machine all in an attempt to encompass and appropriate claims which never should have been issued to plaintiff.

Defendants then state (Proposed Findings of Fact 65):

Plaintiff inspected defendants' machine under a confidentiality agreement (DX-69, Stipulated Facts 17 and 18). Counsel who inspected defendants' machine were also prosecuting the second patent (DX-36, p. 25). After two inspections plaintiff introduced and obtained a claim which clearly could be read only on defendants' machine and not plaintiff's. Claim 5 of U.S. Patent 3,591,436 (DX-35) calls for a "sheet feeder drive having an output connected to said sheet feeder for *intermittently driving said sheet feeder* at a frequency F". The record is clear that plaintiff's machine has the sheet feeding means always running whenever the main drive means is running (Reckseit TR 783) and that only defendants' machine has an intermittently driven sheet feeder (Reckseit TR 783; Fishleigh TR 1316). Mr. Reckseit took the position that the sheet feeder referred to in claim 5 of U.S. Patent 3,591,436 (DX-35) was not in fact a sheet feeder but rather a set of positive feed rolls (TR 1735). However, when confronted with claim 11 of the DX-35 he was forced to take the position that both the "sheet feeder" and

"set of positive feed rolls" referred to in that claim as distinct elements refer to the precise same member of the machine described (TR 1736–8). [emphasis in original]

I do not find the evidence of sufficient quantity or quality to permit me to draw the inference defendants would thrust upon me, one that would discredit the professional ethics of plaintiff's counsel. Accordingly, I reject the equitable finding defendants request based upon this defense.

*Plaintiff's Alleged Misleading Tactics*

■ i. Interrogatory Answer: "No Contention" as to U.S. Patent 3,591,436.

I find that plaintiff's attempt to expedite issuance of the 3,591,436 patent to bring it into the instant suit (which it subsequently attempted to do without success), and in furtherance thereof payment of the final Government fee to insure issuance, is not inconsistent with plaintiff's answer to defendants' Interrogatory 72(a) in which plaintiff stated, after payment of the Government fee, but *prior* to issuance of the 3,591,436 patent, that it was at that time making "no contention" of infringement with respect to any patent other than the patent in suit. Plaintiff, I hold, could not have contended that another patent was infringed by defendants' apparatus since it did not at that time have another patent which it believed was infringed. Plaintiff's answer to the interrogatory was accurate, and did not constitute unfair competition or inequitable conduct.

ii. The Klein Testimony and Alleged Misleading Discovery Responses by Plaintiff.

Defendants allege misconduct in the testimony of Mr. Klein regarding his participation in corporate advertising and in regard to his retirement. I find that Mr. Klein was responsible for certain advertising relating to notices relating to the patent in suit, and to this extent his answer to interrogatory No. 80 was accurate. As to his retirement, Mr. Klein testified that he has technically retired from the operating company but was and is nevertheless actively working. His responses were for the most part accurate in context. Inaccuracies were at most minor inconsistencies.

Plaintiff, it is alleged, was misleading in failing to "identify any apparatus capable of applying individual sheets of material to single face corrugated board." This is a restaging of the essential issue of validity, and I do not perceive any purpose in treating the matter again.

iii. "PRE-LITH" Trademark Registration.

When seeking a trademark registration for "PRE-LITH", plaintiff stated in an application sworn to by Marvin H. Schwartz, its president, on February 24, 1970, that the mark "PRE-LITH" had been used since August 11, 1958 on "corrugated paper board having printed sheets adhesively secured to an outer surface thereof" (DX–91).

■ The testimony, as I recall and credit it, indicates that in 1958 preprinted double face corrugated board had been made by plaintiff from lithographically printed web which was then fed to a conventional corrugator for adhesive joinder with a web of single face corrugated board, which printed double face corrugated web as it came out of the double facer of the corrugating machine was cut into sheets of printed double face corrugated board. The sheets of printed double face board, with which the mark "PRE-LITH" was used in 1958 did, by virtue of the fact that they were, as a final product, in sheet form, fall within the product description of the trademark affidavit, namely, a product ". . . having printed sheets adhesively secured to a cover surface thereof". The fact that the printed sheets, as they are found in the double face sheet product, originated as a printed web fed to the corrugator, does not prevent the double face end product (with which the trademark "PRE-LITH" was used) from having "printed sheets" as the trademark affidavit states. Thus, the state-

ment in the trademark application is sufficiently supported.

iv. Plaintiff's Alleged Acts of Unfair Competition and Patent Misuse.

 Plaintiff, in a news release provided to multiple publications, but insofar as the evidence shows published in only the "Cincinnati Post and Times Star", provided notification of the fact that a suit for patent infringement had been brought by the plaintiff against the defendants. The press release, I find, was factual and not misleading. There is no evidence that any existing or potential customers of defendants read the newspaper report, published only in Cincinnati, which fact is supported by Mr. Benninghoff's testimony that no customer ever mentioned the newspaper report or indicated any knowledge of it. I also find that the plaintiff also instructed its two salesmen, Mr. Ray and Mr. Benninghoff, to apprise customers who inquired that a suit had been filed against defendants. They were not authorized to, and did not go further. They did not advise customers of such absent an inquiry. In only a few instances does the evidence show that even this was done. The evidence shows no damage to defendants as a consequence of the foregoing activities.

Nor do I find merit in the other matters raised by defendants in their Post Trial Memorandum, pp. 77–80.

## ATTORNEYS' FEES

Defendants seek attorneys' fees, costs, and business losses allegedly caused it by plaintiff's conduct.

This application is denied.

I find no basis for inferring plaintiff wilfully attempted to destroy defendants' business, nor do I find this case so exceptional as to warrant attorneys' fees under the patent laws.

I do assess costs against plaintiff, which costs shall include, in addition to the usual items, deposition costs, trial transcript (required to key to the record Proposed Findings of Fact as directed

by me), and expert fees including charts and drawings prepared by or at the direction of defendants' expert, Mr. Fishleigh, which exhibits, in this complex case, were requisite for an understanding of the matter.

An appropriate form of judgment is to be submitted not later than June 25, 1973.